501 P.2d 931

The STATE of Arizona, Appellee,

v.

Richard Charles KOUNTZ, Appellant.

No. 2360.

Supreme Court of Arizona,
In Banc.

Oct. 13, 1972.

Gary K. Nelson, Atty. Gen., Phoenix by John S. O'Dowd, Asst. Atty. Gen., Tucson, for appellee.

Scanlan & Schiesel by Fred T. Scanlan, Tucson, for appellant.

CAMERON, Vice Chief Justice.

This is an appeal from a jury verdict and judgment of guilty to the crime of murder in the first degree (by torture), §§ 13–451 and 13–452 A.R.S., and a sentence of life imprisonment thereon.

We are called upon to answer the following questions:

1. Did the trial court err in the jury instructions defining murder by torture?

2. Did the trial court erroneously admit, over the objection of defendant, testi-

mony of the mother on re-direct examination?

3. Did the trial court err in permitting the State to call three rebuttal witnesses?

4. Did the trial court err in giving the State's jury instruction on inconsistent and contradictory statements by the defendant?

5. Was the verdict of the jury contrary to the weight of the evidence and based on passion and prejudice?

The facts necessary for a determination of this matter on appeal are as follows. The deceased, Allen Robert Woods, a little over three years and one month of age, died as the result of a brain concussion on 7 May 1970. The defendant, Richard Charles Kountz, and the victim's mother, a divorcee, had been dating since the latter part of January, 1970, and had lived together as husband and wife at the place where the deceased was injured from 28 April 1970 to the date the child died. The mother was 28 years old. At the time the defendant met the mother he was 21 years of age, father of a two year old child, and was in the process of obtaining a divorce. He worked as a bricklayer and lived with his parents. He told the mother he was 26, that he was an engineer, and that he was divorced and had a five year old child. He proposed marriage to the mother, she agreed, and the defendant, with the mother's permission, assumed the role of the child's father for the purpose of teaching the child discipline, particularly the taking of a bath in the evening. Testimony of the mother indicated that the defendant refused to allow the mother to be present when he was in the bathroom giving the deceased a bath and that these sessions lasted from an hour to an hour and a half. The testimony of the neighbors indicated that there was loud crying from the bathroom when the defendant would give the child a bath. One witness, a neighbor, testified that during these times he heard sounds "like a person taking two apples and smashing them together." The testimony also indicates that the nursery school that the deceased attended called the child's condition (multiple facial and body bruises) to the health authorities who in turn contacted the child's pediatrician, after which the child was changed to a different nursery.

The defendant, who testified extensively in his own behalf, admitted some of the bruises were caused by him:

"Q  Did you ever hit Allen in the eye?

"A  Yes, sir.

"Q  When was this?

"A  Well, it was while I was living at the motel.

"Q  Will you explain the circumstances to the jury how this happened?

"A  Barbara was gone. I can't remember where she went, but Allen and me, you know, like we were fist fighting, playing, you know, I was sitting on the edge of the bed and Allen was standing up and this one time he came, he just charged at me and I don't [know] whether he slipped or not, but I hit him in the eye and it gave him a mouse underneath his eye.

"Q  You hit him on the cheek rather than the eye?

"A  It wasn't on the eye, just a mouse, like here (indicating).

"Q  Was there any swelling on the cheek?

"A  Yes."

He testified that another time the child fell while they were taking a shower:

"Q  Did Barbara interrupt you at any time while you were taking the shower, giving Allen a bath?

"A  Yes, after the baby fell, you know, she tapped at the door and asked what happened and I just told her that he fell, that he was all right. At that time, you know, I didn't think there was any bruise, I just felt that he fell and didn't know he hurt himself.

"Q Did he cry?

"A Yes.

"Q After you got out of the shower and went back into the other part of the motel wherever you were living, the bedroom, wherever it was, did you and Barbara examine him at that time?

"A I don't think we actually examined him, but all of a sudden there was a bruise.

"Q It was plainly visible at that time?

"A Yes, sir."

And:

"Q Did you at any time strike Allen in the head with your hands or any object?

"A Well, I hit him like, you know, like on the mouth sometimes for saying 'No' or something, but I never hit him on the back of the head, no."

When shown a picture of the deceased he testified:

"Q I show you Plaintiff's exhibit 5 in evidence and ask you if you can hold it up to the jury, hold it up and point out to the jury and show the bruises you inflicted on him.

"A I think I gave him this one (indicating). I think I gave him this one one time with a belt and these bruises right here were from a spanking and possibly—no, I don't think—there was a couple of times I spanked him that he got red on the bottom. It is possibly like this here (indicating), these here, and this one here are from a belt. That is all I can remember."

And:

"Q Do you remember how many times you spanked that child with a belt?

"A I spanked him two times.

"Q With a belt?

"A Yes, sir."

The defendant contended that when he spanked him with a belt he wrapped a towel around him first.

After the nursey reported the condition of the child the child was transferred to another nursery school. The mother testified:

"Q Did you have any conversation with the defendant concerning the call from the nurse?

"A Yes, that same afternoon after the nurse called, he called me at the office and I told him what had happened.

"Q What was his reaction to that?

"A He was very upset that the nursery would take a step like they did, and he didn't feel that the baby should be taken to the doctor."

On the day the child died, the defendant picked the child up from the beauty parlor where the mother was having her hair done and took him home. At about 5:30 the defendant went to the neighbors and stated: "For God's sake, please call the Fire Rescue Squad, I think the baby fell in the bathtub and I think he has drowned." The fire department responded and efforts to revive the child by artificial resuscitation failed. The officers and people testified that the child was not wet and had evidently not been in the tub. The defendant claimed that he had left the child in the tub to take a bath and had gone to put some license plates on the car and when he got back the child was hanging over the tub. The child was pronounced dead at the hospital.

Dr. Louis Hirsch, a pathologist who performed the autopsy, testified that the child died as a result of a concussion produced by "multiple blunt traumas applied to the skull" and that the most recent trauma was the cause of death with the earlier injuries as contributing causes.

## OBJECTIONS TO THE INSTRUCTIONS CONCERNING THE DEFINITION OF THE MURDER

The instructions complained of read as follows:

"You are also instructed that murder which is perpetrated by means of torture

or by any other kind of willful, deliberate and premeditated killing, is murder in the first degree, with certain exceptions not applicable here. All other kinds of murder are of the second degree.

"You are instructed that murder which is perpetrated by torture is murder of the first degree.

"The essential elements of such a murder are (one) the act or acts which caused the death must involve a high degree of probability of death, and (two) the defendant must commit pain and suffering for the purpose of revenge, extortion, persuasion or to satisfy some other untoward propensity.

"The crime of murder by torture does not necessarily require any proof that the defendant intended to kill the deceased, nor does it necessarily require any proof that the deceased suffered pain."

This court has stated:

"Murder is perpetrated by torture when the assailant intends to cause cruel suffering for the purpose of revenge, extortion, persuasion, or to satisfy some other untoward propensity. People v. Daugherty, 40 Cal.2d 876, 256 P.2d 911, cert. den. 346 U.S. 827, 74 S.Ct. 47, 98 L.Ed. 352. There need not be an intent to cause death, but there must be a separate intent to cause extreme pain and suffering for one of the enumerated purposes. People v. Anderson, [63] Cal. [2d 351], 46 Cal.Rptr. 763, 406 P.2d 43; People v. Tubby, 34 Cal.2d 72, 207 P.2d 51; Townsend v. People, 107 Colo. 258, 111 P.2d 236. It is not enough that defendant intended to cause extreme pain and suffering; there must also be evidence that he did so for revenge, extortion, persuasion or some other untoward propensity. Townsend v. People, supra; People v. Heslen, Cal., 163 P.2d 21, modified 27 Cal.2d 520, 165 P.2d 250. Furthermore, the death must have been caused by the torture. State v. Folk, 78 Ariz. 205, 277 P.2d 1016." State v.

Brock, 101 Ariz. 168, 171, 416 P.2d 601, 604 (1966).

■ The defendant contends that the evidence introduced at the trial did not show that the defendant was intent on causing cruel pain or suffering to the child, nor did it show any intent on the part of the defendant to exercise "revenge, extortion, persuasion or some other untoward propensity." State v. Brock, supra. We disagree. The testimony is ample from which the jury could find that the defendant was systematically and cruelly torturing the child, as a result of which actions on the part of the defendant the child died.

### REDIRECT TESTIMONY OF THE MOTHER

On direct examination, the mother was not allowed to testify concerning a conversation she had with the child on Thursday morning while giving the child a bath. The conversation was excluded by the court on the objection of the defendant. The defendant on cross-examination went into the subject of the child's feelings for the defendant and whether on the day the child died the child went willingly with the defendant from the beauty shop. On redirect the court permitted the County Attorney to examine the child's mother concerning the particular conversation. The mother testified over objection by the attorney for the defendant:

"Q Did you question the baby concerning why he didn't like to take baths?

"A Yes.

"Q Did you particularly concern yourself as to why he didn't like to take baths that were administered by the defendant?

"A Yes, that was the main object.

"Q Just what was the conversation?

"MR. SCANLAN: Objection, improper redirect examination.

\* \* \* \* \* \*

"THE COURT: Objection overruled.
\* \* \*

\* \* \* \* \* \*

"THE COURT: Continue.

"A I asked the baby, and kept asking him, 'Why won't you let Richard give you a bath. You don't mind when mamma gives you a bath.' And he finally said, 'Hot, hot, water hot'."

■ The testimony concerning the child's state of mind was otherwise admissible. State v. Izzo, 94 Ariz. 226, 383 P.2d 116 (1963). We do not feel it was improper redirect. Even were it questionable, we would not disturb the decision to allow testimony to be admitted as the trial court is allowed considerable latitude in the sequence of proof. State v. Vallejos, 89 Ariz. 76, 358 P.2d 178 (1960); State v. Farrell, 1 Ariz.App. 112, 399 P.2d 915 (1965).

## THE THREE REBUTTAL WITNESSES

■ The first witness, Mrs. Maxine York, was called in rebuttal to contradict the testimony of the defendant concerning the events that occurred when the defendant asked the Yorks to call the Fire Rescue Squad. Mrs. York also gave other testimony which was damaging to the defendant concerning the fact that there was blood in the bathroom area, etc., which the defendant denied. We find no error in allowing Mrs. York to testify as a rebuttal witness. The testimony of the two witnesses, Thomas Wilson and Ralph O'Neil, two City of Tucson Police Officers, who took a statement from the defendant at the hospital, also contradicted testimony that the defendant made on the stand.

We have stated:

"We do not believe that this was an abuse of discretion for on rebuttal the state may offer any competent evidence which is a direct reply to or a contradiction of any material evidence introduced by the accused even though it may tend to prove another offense or strengthen the prosecution's case." State v. Kuhnley, 74 Ariz. 10, 19, 242 P.2d 843, 849 (1952).

The Court of Appeals has stated: "Generally, where the defendant, by putting on testimony opens the door to proper rebuttal, he cannot complain if rebuttal testimony, offered by the State, also tends to prove or reinforce the State's case in chief \* \* \*." State v. Dowthard, 3 Ariz.App. 237, 239, 413 P.2d 296, 298 (1966).

## STATE'S INSTRUCTION NO. 13

■ Defendant objected to the reading of the State's instruction No. 13 in which the jury was instructed as follows:

"You are also instructed that evidence, if any, that the defendant, on one or more occasions other than from the witness stand, made false or contradictory statements concerning the charge against him which now is being tried may be considered by the Jury as a circumstance tending to prove a consciousness of guilt, that it is not sufficient of itself to prove guilt. The weight to be given to such a circumstance, the significance, if any, to be attached to it, are matters for the Jury to determine."

This instruction was specifically approved by our Court of Appeals in State v. Vann, 11 Ariz.App. 180, 463 P.2d 75 (1970) and is not error when, as under the facts of this case, it is supported by the evidence. CALJIC, 2.03, Criminal Third Edition.

## THE VERDICT WAS CONTRARY TO THE WEIGHT OF THE EVIDENCE

The defendant contends:

"that the verdict and judgment are wholly unsupported by the evidence and are contrary to law for the reason that no evidence was presented proving that the Appellant acted with malice or with the intent to torture the child nor was any evidence presented to indicate that the child died from other than accidental means."

■ We disagree. Admittedly, only the defendant knows what his motives were,

but the facts in this case and particularly the bruised and battered condition of the child's body were more than sufficient from which the jury could infer and find that the defendant intended to and did kill the child in a manner contemplated by the statute.

We have read the entire transcript and we believe the state of the record is ample from which the jury could find the defendant guilty of murder in the first degree by torture.

Judgment affirmed.

HAYS, C. J., and STRUCKMEYER and HOLOHAN, JJ., concur.