587 P.2d 236

**The STATE of Arizona, Appellee,**

v.

**Joe Cota MORALES, Appellant.**

**No. 3769.**

Supreme Court of Arizona,
In Banc.

Oct. 30, 1978.

Rehearing Denied Dec. 5, 1978.

Bruce E. Babbitt, Former Atty. Gen., John A. LaSota, Jr., Atty. Gen. by William J. Schafer, III, and R. Wayne Ford, Asst. Attorneys Gen., Phoenix, for appellee.

Callahan, Cathcart & Gorman by Edwin F. Cathcart, Jr., Tempe, for appellant.

CAMERON, Chief Justice.

This is an appeal from a jury verdict and judgment of guilt to the crime of first degree murder, A.R.S. § 13–452, and a sentence of death. We take jurisdiction pursuant to A.R.S. § 13–1711 and Rule 26.15, Rules of Criminal Procedure, 17 A.R.S.

We are asked to decide the following questions:

1. Did the trial court commit reversible error in precluding defense counsel from attacking the credibility of witness Cruz Martinez by showing the punishment he might have received had he not agreed to testify against the defendant?

2. Did the trial court's refusal to permit the use of a witness's juvenile adjudication as a delinquent deprive the defendant of his constitutional right to cross-examine an accusing witness?

3. Did the trial court commit reversible error in allowing the introduction of an allegedly gruesome photograph into evidence?

4. Did the trial court commit reversible error in instructing the jury not to consider the effect of intoxication on the defendant's ability to form the requisite intent in the crime of murder by torture?

5. Did the trial court commit reversible error in refusing to give the jury the defendant's requested instruction and form of verdict for voluntary manslaughter?

6. Did the trial court err in denying the defendant's motion for judgment of acquittal on the murder by torture theory?

7. Did the trial court err in failing to direct a verdict of not guilty or acquittal on the premeditated first degree murder charge?

8. Did the trial court err in denying defendant's motion for mistrial based on two jurors' observation of a spectator's apparent attempt to intimidate the State's chief witness?

9. Did the trial court err in finding the existence of aggravating circumstance number 6: that the defendant committed the offense in an especially heinous, cruel or depraved manner?

10. Did the trial court err in denying defendant's motion to continue the sentencing?

11. Is Arizona's death penalty statute unconstitutional?

The facts necessary for a determination of this matter are as follows. At approximately 11:00 p. m. on 10 April 1976, two young men who were residents of a government housing project in Glendale, Arizona, Cruz Martinez and Tony Calistro, walked from the project area to a neighborhood Low Cost Market a few blocks away to

purchase some beer. Outside the market they met two other men, Joe Morales (the defendant in this case) and Ruben Melendez, the codefendant. After some discussion, they entered the market and obtained some beer and a bottle of whiskey. The four returned to the project area and gathered in the backyard of Morales where they began drinking. There is evidence that considerable drinking had been done earlier in the day. Within a short time, Melendez and Morales began wrestling and "slap boxing." Calistro shouted encouragement to the participants, urging each to hit the other and commenting on Melendez's lack of prowess. Melendez responded to Calistro's antics by shoving him off his chair. After he got back up onto his chair, Calistro was again shoved to the ground. This time all three of the others jumped on him and hit him. Morales suggested that Calistro be stripped. Calistro's clothes were removed and he was carried across an alley to a park where he was placed on a merry-go-round and whirled around for about two minutes. He was then taken from the merry-go-round and beaten and kicked continuously by Melendez, Morales and Martinez. Melendez sodomized him. Morales apparently tried but was unsuccessful. Morales suggested that they "get something to stick up his ass." Martinez went back to Morales' house and returned with a garden hoe and a can of yellow paint. The hoe handle was rammed into Calistro's rectum and paint was poured all over his body including his face and mouth. Calistro was then carried to a cement climbing device in the park from which he was hung by his waist while his arms and legs were tied with his clothing. He was again sodomized by Melendez. Both Martinez and Melendez rammed the hoe handle into his rectum several times and Morales stabbed him. When the three left the victim, he was still struggling and breathing heavily. The three returned to Morales' backyard where they continued drinking beer. Morales said, "I stabbed him," and Melendez got angry saying "Goddammit, you didn't have to do that." Morales warned Melendez and Martinez not to say anything and then Morales stated, "I

am going back to finish him off." The group then disbanded.

The next morning Calistro's nude body was found in the climbing device in the park. In addition to numerous other injuries, the body had 19 stab wounds, 12 of which were non-superficial. After an investigation, Morales and Melendez were charged with first degree murder. Martinez, a minor, agreed to testify against Morales and Melendez in exchange for the county attorney's promise not to request that he be transferred to adult court for prosecution for murder. In the joint trial of Morales and Melendez, the State proceeded on a murder by torture theory as to both defendants as well as a premeditated murder theory as to Morales, the defendant herein. The jury found both Morales and Melendez guilty of first degree murder and after an aggravation and mitigation hearing, the trial court sentenced both to death.

## EXCLUSION OF REFERENCE TO WITNESS'S POSSIBLE DEATH PENALTY

■ The State's chief witness in this case, fifteen year old Cruz Martinez, had been a principal participant with the defendants in the activities resulting in the death of Tony Calistro. His testimony at trial was given pursuant to an agreement with the county attorney, approved by the judge of the juvenile court, which provided in substance that Martinez was to give a sworn statement of the events occurring on the night of the offense. If the county attorney determined from this statement that Martinez' testimony would be of "substantial aid" in the prosecution of Morales and Melendez, the State would withdraw its request that Martinez be transferred to adult court for prosecution for first degree murder along with defendants Morales and Melendez. Martinez was to enter an admission to an unrelated burglary charge and a "conditional" admission to a charge of second degree murder in juvenile court. Disposition of Martinez' case was to be postponed until after his testimony at trial.

Evidence of this agreement was presented at trial. The jury was also informed that as a result of the agreement, Cruz Martinez would be subject to the Department of Corrections only until his 21st birthday. In an effort to further attack his credibility by demonstrating a motive or interest in testifying as he did, defense counsel sought to bring out the fact that had Martinez been remanded to the adult court, he would have faced, upon conviction, the possible penalty of death or life in prison without possibility of parole for 25 years. The trial court precluded defense counsel for bringing this fact to the jury's attention through cross-examination of Martinez or his attorney. Defense counsel contends that this was reversible error. We agree. We have stated:

"* * * great latitude should be allowed in the cross-examination of an accomplice or co-defendant who has turned State's evidence and testifies on behalf of the State on a trial of his co-defendant.
* * *

* * * * * *

"While it is true that the extent of such cross-examination is with the sound discretion of the trial judge; nevertheless, if the trial judge has excluded testimony which would clearly show bias, interest, favor, hostility, prejudice, promise or hope of reward, it is error and will be ground for a new trial. [citations omitted]" *State v. Holden*, 88 Ariz. 43, 54–55, 352 P.2d 705, 713–714 (1960).

It appears from the record that the trial court's reason for precluding evidence of the penalty the witness could have received was to prevent the jury from learning of the penalty the defendants in this case might receive if convicted of first degree murder. Whatever merit this reason may have, it cannot outweigh the right of the defendant to cross-examine the State's major witness on what he expects in return for his testimony. The fact that the witness faced a possible death penalty if he did not testify for the State surely would be a factor if not the factor in the witness's decision to testify. The trial court's refusal

to allow inquiry into the penalty the witness would have faced had he not agreed to testify was reversible error.

## USE OF WITNESS'S JUVENILE RECORD TO IMPEACH HIS GENERAL CREDIBILITY

■ At trial, Ricky Amparana testified for the State that he saw the defendant, Cruz Martinez and one other individual whom he could not recognize, drinking together in the vicinity of the park in which the homicide occurred. He testified that while walking home from a party on the night in question, he met three people, two of whom he recognized as the defendant Morales and Cruz Martinez, in the vicinity of the park in which the victim was later found. He testified that he was invited to join them, but having already consumed more alcohol than his system could tolerate, he declined the invitation and proceeded home.

In 1973, Ricky Amparana had been adjudged delinquent following his entry of a plea of guilty to what would amount to the crime of burglary had he been an adult. Defense counsel sought to use this information for the purpose of attacking the witness's general credibility. The trial court refused to allow him to do so and on appeal the defendant contends that this refusal constituted reversible error in that it deprived him of his constitutional right, guaranteed by the confrontation clause of the Sixth Amendment, to a full and effective cross-examination of an accusing witness. We do not agree.

This State's policy behind the general inadmissibility for impeachment purposes of a witness' juvenile record was declared by this court 26 years ago:

"The policy of the juvenile law is to hide youthful errors from the full gaze of the public and to bury them in the graveyard of the forgotten past." *State v. Guerrero*, 58 Ariz. 421, 430, 120 P.2d 798, 802 (1942). See also A.R.S. § 8–207.

The defendant contends, however, that a state's interest in preserving the anonymity

of juvenile offenders must give way to a criminal defendant's interest in effectively cross-examining his accusers, citing *Davis v. Alaska*, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974). In *Davis*, supra, a key witness for the state was, at the time of the trial and at the time of the events to which he testified, on probation by order of a juvenile court after having been adjudged a delinquent for acts of burglary. The United States Supreme Court held that the trial court's protective order prohibiting questioning of the witness regarding his delinquency and probation status unconstitutionally deprived the defendant of his right of confrontation of witnesses under the Sixth and Fourteenth Amendments.

In his concurring opinion, however, Justice Stewart pointed out:

"The Court holds that, in the circumstances of this case, the Sixth and Fourteenth Amendments conferred the right to cross-examine a particular prosecution witness about his delinquency adjudication for burglary and his status as a probationer. Such cross-examination was necessary in this case in order 'to show the existence of possible bias and prejudice . . . ,' ante, at 1111. In joining the Court's opinion, I would emphasize that the Court neither holds nor suggests that the Constitution confers a right in every case to impeach the general credibility of a witness through cross-examination about his past delinquency adjudications or criminal convictions." 415 U.S. at 321, 94 S.Ct. at 1112–13, 39 L.Ed.2d at 356.

We believe the facts in *Davis*, supra, are distinguishable from the facts in the instant case. Here, there was no showing that the witness was on probation at the time he gave his testimony. His testimony could not in any way affect his treatment by the juvenile court and there was no compulsion upon him to testify. The use of the witness' juvenile record was sought only for the purpose of attacking his general credibility and did not go to a bias or motive for his trial testimony. We find no error in the trial court's precluding the defendant from using the witness' prior juvenile record during cross-examination for the purpose of impeaching his general credibility.

## ADMISSION OF A GRUESOME PHOTOGRAPHIC SLIDE INTO EVIDENCE

During the State's direct examination of the county medical examiner who performed the autopsy on the victim's body, the trial court admitted into evidence, over defendant's objection, State's exhibit Number 16. This exhibit is a color slide photograph picturing the victim's rectum and anus after removal from the body during the autopsy. With the aid of this slide, which was projected on a screen for the jury, the medical examiner testified as to the internal trauma to the victim's rectal area and its apparent cause:

"This is a photograph of Mr. Calistro's rectum and the anus after it was removed from the body and the rectum opened up and laid out on the table as you see it there. And the hoe was put beside it to illustrate that from the anus here up to the end of this injury, which is the red that you see, all along here, that's bleeding beneath the lining of the rectum. The distance up here was eleven inches. The hoe was bloody from here up to approximately where it joined the middle part of the hoe, and the blood extended for a distance of 11 and a half inches from the tip here.

"There is one error in this picture that I should point out. The hoe should have been turned around the other way, but other than that, it does illustrate the corresponding between the blow and the hoe and the injury inside the rectum. * *

\* \* \* \* \* \*

"Q The size and shape of the hoe handle is compatible with the injuries you see there to the anus and the rectum?
"A Yes, sir."

Although the medical examiner's opinion was that the victim's internal bleeding due to his multiple stab wounds was the cause of his death, he testified that the injuries to

the rectum "played some part" and "contributed to some extent."

On appeal, defendant contends that the admission of this slide photograph into evidence was reversible error in that its prejudicial, inflammatory nature outweighed its probative value.

We have stated:

"Photographs having probative value are admissible in evidence whether they are in black and white or color. *State v. Brady*, 105 Ariz. 190, 461 P.2d 488 (1969). They must, of course, be relevant to an issue in the case and may be admitted in evidence to identify the deceased, to show the location of the mortal wounds, to show how the crime was committed and to aid the jury in understanding the testimony of the witnesses. *State v. Robinson*, 89 Ariz. 224, 360 P.2d 474 (1961). If the photographs have any bearing upon any issue in the case they may be received although they may also have a tendency to prejudice the jury against the person who committed the offense. The discretion of the trial court will not be disturbed on appeal unless it has been clearly abused. See *Miranda v. State*, 42 Ariz. 358, 26 P.2d 241 (1933)." *State v. Mohr*, 106 Ariz. 402, 403, 476 P.2d 857, 858 (1970).

To begin with, we do not find the picture of the section of the rectum and anus, shown alone and severed from the body, as inflammatory or gruesome as the defendant contends. The section, by being removed from the body, has been dehumanized to the extent that it is not as repellent as it would have been had it been shown while still attached to the body of the deceased. Testimony has also been presented that the hoe handle had been forcefully thrust into the victim's rectum eight times. The condition of the rectum and anus, therefore, was probative of whether there was intent to torture the victim. *State v. Brock*, 101 Ariz. 168, 416 P.2d 601 (1966). The photographic slide tended to corroborate that testimony.

We find no abuse of discretion in the trial court's decision to admit State's exhibit Number 16 into evidence.

## WHETHER THE JURY WAS PROPERLY PRECLUDED FROM CONSIDERING INTOXICATION AS A DEFENSE TO MURDER BY TORTURE

■ Our statute reads:

" * * * when the actual existence of any particular purpose, motive or intent is a necessary element to constitute any particular species or degree of crime, the jury may take into consideration the fact that the accused was intoxicated at the time in determining the purpose, motive or intent with which he committed the act." A.R.S. § 13–132.

The trial court, over defendant's objections, gave the following instruction:

"You should in no way consider the effect of intoxicating liquor upon a defendant's ability to form an intent in the crime of murder by torture."

Defendant contends that the giving of this instruction constituted reversible error in that murder by torture is a specific intent crime to which voluntary intoxication is a defense. We agree.

The distinction between crimes of specific intent and crimes of general intent was spelled out by this court in *State v. Jamison*, 110 Ariz. 245, 517 P.2d 1241 (1974):

"There are two types of intent in criminal law, general and specific. In crimes of general intent, the party is presumed to have the requisite criminal intent from the commission of the crime itself. Specific intent, however, is an additional mental element to certain crimes, and criminal statutes that use the words 'wilfully' or 'intentionally' will usually require a specified intent as, for example, assault with intent to commit murder which requires a specific intent on the part of the defendant to commit a murder, in addition to a general intent to commit an assault.

"The difference between general and specific intent is important in a case like the one before the court because of the different burden placed on both the State and the defense. In general intent cases,

once the commission of the crime has been shown, the absence of general intent may be shown by the defendant, but this is the defendant's burden and voluntary intoxication will not negate general intent.

"On the other hand, in crimes of specific intent, this specific intent must be proved by the State and voluntary intoxication may be a defense." 110 Ariz. at 248, 517 P.2d at 1244.

A.R.S. § 13–452, as amended, defines first degree murder as murder

"perpetrated by means of poison or lying in wait, torture or *by any other kind of wilful, deliberate and premeditated killing* * * *." (emphasis added)

The use of the phrase "or by any other kind of" suggests that the legislature intended murders by poison, lying in wait and torture to be classified as murders in the first degree only when the defendant's act or conduct was wilful, deliberate or premeditated. As to murder by torture, we have stated:

"Murder is perpetrated by torture when the assailant intends to cause cruel suffering for the purpose of revenge, extortion, persuasion, or to satisfy some other untoward propensity. [citation omitted] There need not be an intent to cause death, but there must be a separate intent to cause extreme pain and suffering for one of the enumerated purposes. [citations omitted]" *State v. Brock*, 101 Ariz. 168, 171, 416 P.2d 601, 604 (1966).

Our statute was adopted from California. *State v. Miller*, 110 Ariz. 489, 520 P.2d 1113 (1974). The California Supreme Court has stated in construing its torture-murder statute:

"The element of calculated deliberation is required for a torture murder conviction for the same reasons that it is required for most other kinds of first degree murder. It is not the amount of pain inflicted which distinguishes a torturer from another murderer, as most killings involve significant pain. [citation omitted] Rather, it is the state of mind of the torturer—the cold-blooded intent to inflict pain for personal gain or satisfaction—which society condemns. Such a crime is more susceptible to the deterrence of first degree murder sanctions and comparatively more deplorable than lesser categories of murder.

"Accordingly, we hold that murder by means of torture under section 189 is murder committed with a wilful, deliberate, and premeditated intent to inflict extreme and prolonged pain. * * * "We do not hold that a defendant must have had a premeditated intent to *kill* in order to be convicted of murder by means of torture; such an interpretation would render superfluous the specific inclusion of murder by torture in section 189. A defendant need not have any intent to kill to be convicted of this crime [citation omitted], but he or she must have the defined intent to inflict pain." *People v. Steger*, 16 Cal.3d 539, 128 Cal.Rptr. 161, 165, 546 P.2d 665, 669 (1976). See also *People v. Tubby*, 34 Cal.2d 72, 207 P.2d 51 (1949).

The State, however, relies on *State v. Gonzales*, 111 Ariz. 38, 523 P.2d 66 (1974); *State v. Kountz*, 108 Ariz. 459, 501 P.2d 931 (1972); and *State v. Brock*, supra, for the proposition that first degree murder by torture is a general intent crime. In those cases we held that the battered or mutilated condition of the victim's body could give rise to an inference that the defendant intended to cause extreme pain and suffering for the purpose of satisfying some "untoward propensity." Such holdings in no way preclude rebuttal of such an inference by introduction of evidence of intoxication. Indeed, in *Gonzales* the defendant's defense was temporary insanity as a result of intoxication. Although the trial court, sitting as the trier of fact, found the defendant's claim of intoxication was not supported by the evidence, he did properly consider the defendant's claim and permitted him to attempt to support it.

We hold that the crime of murder by torture requires proof, from either direct or circumstantial evidence, that the defendant possessed the specific intent to cause ex-

treme pain and suffering for the purpose of revenge, extortion, persuasion, or to satisfy some untoward propensity. *Brock*, supra. Intoxication may prevent the formation of such an intent. The trial court therefore erred in instructing the jury not to consider the effect of intoxicating liquor upon the defendant's ability to form an intent in the crime of murder by torture.

## WHETHER EVIDENCE OF INTOXICATION JUSTIFIES A JURY INSTRUCTION ON VOLUNTARY MANSLAUGHTER

■ During the trial, defense counsel requested the trial court to present the jury with a voluntary manslaughter verdict form and to instruct the jury on voluntary manslaughter. Defense counsel's position was that the jury should be allowed to consider whether the defendant's intoxication prevented the formation of malice aforethought, a necessary element of murder, thus reducing the crime to voluntary manslaughter. The prosecutor's position was that a voluntary manslaughter instruction and verdict form could only be given to the jury in cases involving a sudden quarrel or heat of passion, a situation which he argued was not presented by this case.

A.R.S. § 13–455 defines manslaughter as "the unlawful killing of a human being without malice." The criminal code lists three kinds of manslaughter, the first being

"1. Voluntary, upon a sudden quarrel or heat of passion." A.R.S. § 13–456(A)(1).

We have stated:

"Appellant also argues that it was error for the trial court to fail to instruct the jury on voluntary manslaughter. As to this, the evidence does not support an instruction on voluntary manslaughter. The defense theory of the case was that the shooting was an accident, or that defendant was in a drug stupor at the time of the offense. There was no showing that Leandra Fowler was slain upon a sudden quarrel or in the heat of passion, as is required by A.R.S. § 13–456(A)(1). Instructions which are clearly not supported by the evidence are improper. [ci-

tations omitted]" *State v. Caruthers*, 110 Ariz. 345, 347, 519 P.2d 44, 46 (1974). See also *State v. Doss*, 116 Ariz. 156, 568 P.2d 1054 (1977).

And:

"A sudden quarrel or a killing in the heat of passion is a prerequisite to voluntary manslaughter. A.R.S. § 13–456(A)(1) (Supp.1973). \* \* \*" *State v. Humphrey*, 23 Ariz.App. 204, 206, 531 P.2d 1142, 1144 (1975).

Were these the only cases on the subject, we would have no difficulty. There are, however, opinions of this court which seem to hold that because malice aforethought is the difference between murder and manslaughter

"\* \* \* voluntary intoxication or drunkenness is to be taken into consideration in determining the existence or nonexistence of malice aforethought, which distinguishes murder from manslaughter." *State v. Hudson*, 85 Ariz. 77, 80, 331 P.2d 1092, 1095 (1958).

And:

"The record reveals there was sufficient evidence of defendant's state of intoxication at the time of the homicide to present a question of fact for the jury as to whether defendant was capable of entertaining a malicious intent or the malice aforethought required for conviction of second-degree murder. The trial court, therefore, properly instructed the jury as to the possible verdict of manslaughter." *State v. Contreras*, 107 Ariz. 68, 69–70, 481 P.2d 861, 863 (1971).

See also *State v. Magby*, 113 Ariz. 345, 554 P.2d 1272 (1976) stating:

"Whether the intoxication negated the malice and reduced the crime from murder to manslaughter is a question of fact to be determined by the jury." 113 Ariz. at 353, 554 P.2d at 1280.

See also *State v. Saunders*, 102 Ariz. 565, 435 P.2d 39 (1967); A.R.S. § 13–132; *State v. Kabinto*, 106 Ariz. 575, 480 P.2d 1 (1971); *State v. Duke*, 110 Ariz. 320, 518 P.2d 570 (1974); *State v. Drury*, 110 Ariz. 447, 520 P.2d 495 (1974); *State v. Ramirez*, 116 Ariz.

259, 569 P.2d 201 (1977); R. Gerber & F. Foreman, Arizona's Criminal Law: The Critical Need for Comprehensive Revision, 18 Ariz.L.Rev. 63, 69–73.

All of these cases, however, have one thing in common: in all of the cases there was first evidence of sudden quarrel or heat of passion which made a manslaughter instruction appropriate. Under these circumstances it was proper to give a voluntary intoxication instruction which had the effect of negating the malice aforethought which is the difference between murder and manslaughter.

In the instant case, there was no sudden quarrel or heat of passion. It was either murder or nothing, and it would have been error to instruct that intoxication could reduce the crime from murder to manslaughter. We find no error.

## DENIAL OF THE MOTION FOR ACQUITTAL ON THE MURDER BY TORTURE CHARGE

■ At the close of presentation of the State's evidence, Morales joined in his codefendant's motion for acquittal on the first degree murder by torture charge on the ground that there was no evidence of the requisite intent to cause extreme pain and suffering for the purpose of revenge, extortion, persuasion, or to satisfy some other untoward propensity. The defendant contends that the trial court's denial of this motion constituted reversible error. In so contending, the defendant relies on language in the recent California case of *People v. Wiley*, 18 Cal.3d 162, 133 Cal.Rptr. 135, 554 P.2d 881 (1976), stating that

" * * * murder by torture cannot be inferred solely from the condition of the victim's body (citation omitted), or from the mode of assault or injury suffered (citation omitted), but other evidence of intent to cause suffering is also required. (citations omitted)" 18 Cal.3d at 168, 133 Cal.Rptr. at 138, 554 P.2d at 884.

We do not believe *Wiley*, supra, is applicable.

In addition to demonstrative evidence as to the condition of the victim's body, testimony presented at trial indicated that the defendant and his accomplices had beaten and kicked the victim, stripped him, carried him to a nearby park, placed him on a merry-go-round and spun it, threw him to the ground, hit and kicked him in the face, chest and stomach, sodomized him several times, covered him with paint, jammed a hoe handle up his rectum several times, placed him in an injury-aggravating position in a playground concrete statue, hit him several times on the head with the hoe, and stabbed him several times in the chest and back. Without question, sufficient and substantial evidence was presented from which a jury could reasonably infer an intent on the part of the defendants to cause extreme pain and suffering for one of the enumerated purposes. We find no error.

## DENIAL OF MOTION FOR DIRECTED VERDICT OR ACQUITTAL ON THE PREMEDITATED MURDER CHARGE

Unlike his codefendant whose first degree murder charge was based solely on a murder-by-torture theory, the defendant's charge of first degree murder was based on two theories: murder by torture and premeditation. The State's theory of premeditation rested at trial on the testimony of the defendant's accomplices that after leaving the victim at the playground, the defendant told them he was going back to "finish him off." It is the defendant's contention that the trial court erred in failing to direct a verdict on the premeditation murder theory because the only evidence against him which could have shown premeditation came from uncorroborated testimony of accomplices in violation of A.R.S. § 13–136 as it existed at the time of the crime. It read:

"§ 13–136. *Accomplice; Testimony and corroboration*

"A conviction shall not be had on the testimony of an accomplice unless the accomplice is corroborated by other evidence which, in itself and without aid of the testimony of the accomplice, tends to connect the defendant with the commis-

sion of the offense. The corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof."

A.R.S. § 13–136 was repealed (effective 24 June 1976) prior to the commencement of the defendant's trial, but after the commission of the offense. The jury was instructed that a determination of guilt could not be based solely on the testimony of accomplices. In its response to the defendant's appeal, the State contends that A.R.S. § 13–136 has no application to this case since the trial was held after its repeal. The defendant contends that it does apply because its non-application would constitute a violation of the Constitution's prohibition of ex post facto legislation. Art. 1, § 9, United States Constitution; Art. 2, § 25, Arizona Constitution.

We need not consider at this time whether the statute's repeal would amount to an ex post facto law. There was, we believe, sufficient evidence of corroboration from which the trial court could deny a motion for directed verdict of acquittal based upon the statute as it existed at the time of the crime. The jury was properly instructed that they could find the defendant guilty only if there was sufficient corroboration of the accomplice's testimony.

■■■■ The purpose of the statute is to require some evidence to lend credibility to the accomplice's testimony which will enable the trier of fact to believe the accomplice's testimony. To satisfy this statute, the independent evidence must tend to connect the defendant to the crime even if only to a slight degree. *State v. Holsinger*, 115 Ariz. 89, 563 P.2d 888 (1977); *State v. Blazak*, 114 Ariz. 199, 560 P.2d 54 (1977). The evidence showed that a Raul Lopez, not an accomplice, who lived across the street from the park where the killing took place, observed Morales, Martinez and Melendez with the victim; that he saw them take the victim to the park, put him on the merry-go-round, spin it and that he saw Morales and Melendez hitting the victim. We believe there was enough independent evidence which tended to corroborate the ac-

complice's testimony not only to murder by torture, but also to murder by malice. We find no error.

## SPECTATOR MISCONDUCT

Defendant contends it was error to deny his motion for mistrial based upon two jurors' observation of spectator misconduct during the trial. Since this misconduct is not likely to reoccur at the retrial of this matter, we need not consider it on appeal.

## AGGRAVATING CIRCUMSTANCES

Defendant claims that the trial court erred in finding the crime had been committed in an especially heinous, cruel or depraved manner. Based upon the facts in the instant case, we can imagine few cases more heinous, cruel or depraved. The trial court will, of course, have to make this determination again based upon the record at the retrial, and we need not consider it further at this time.

## CONTINUING THE SENTENCING

Defendant asked for a continuance of the hearing in aggravation in order for defendant to obtain more evidence. His motion was denied and he assigned this as error on appeal. We need not consider that at this time since the matter will have to be retried and if found guilty a new hearing and sentencing will be provided then.

## CONSTITUTIONALITY OF THE DEATH PENALTY STATUTE

Questions concerning the death penalty and sentencing procedures have been answered by our recent case of *State v. Watson*, 120 Ariz. 441, 586 P.2d 1253, 1978. If defendant should be convicted on retrial, the sentencing procedures should conform to *Watson*, supra, and we need not consider the matter at this time.

Judgment reversed and the matter remanded for new trial.

STRUCKMEYER, V. C. J., and HAYS, HOLOHAN and GORDON, JJ., concur.