614 P.2d 835

**STATE of Arizona, Appellee,**

v.

**Allen WATKINS aka James Allen Pridgen, Appellant.**

**No. 4774.**

Supreme Court of Arizona, In Banc.

July 10, 1980.

Robert K. Corbin, Atty. Gen., William J. Schafer III, Chief Counsel, Criminal Division, Barbara A. Jarrett, Asst. Atty. Gen., Phoenix, for appellee.

John N. Nelson, Yuma, for appellant.

Allen Watkins, in pro. per.

GORDON, Justice:

Defendant Allen Watkins appeals his convictions and consecutive sentences of seven and a half years imprisonment for aggravated assault and life imprisonment for first-degree murder. Jurisdiction is established by A.R.S. § 13–4031.

On the morning of February 27, 1979, defendant and two friends, Junior Law and Ace Phillips, began drinking beer at a local bar. As the day progressed, they moved to another bar to continue drinking and to play pool. An argument developed between defendant and Junior Law, and defendant invited Law outside to fight. The bar owner, afraid for Law's safety, made defendant leave the premises, after Law refused to fight.

Another friend of defendant, Larry Crider, happened by soon after and drove defendant home. Crider testified that defendant was a "little bit" mad about Law's refusal to fight, but did not appear drunk.

Defendant shared a bachelor's apartment with Kimberly Pritchard, which she rented from Ace Phillips and his wife Madonna, who lived next door. Defendant had met Pritchard in early January, 1979, had moved in with her several days later, and was living with her for about one and a half months until his arrest for the instant offenses.

When Pritchard returned home from work that day, defendant was lying on the bed with a gun in his hand. He appeared to be very upset about something but did not appear drunk. When pressed as to what was the matter, defendant told Pritchard: "Don't worry about it, everything is going to be alright tomorrow. I am going to kill Junior and I am going to kill Ace as soon as they come home." An extended argument ensued, during the course of which defendant struck Pritchard in the face and arms with his fists, threatened to kill her, damaged a number of objects in the apartment, went outside and fired the gun, and threw two pieces of broken concrete at Pritchard. Pritchard received numerous bruises and a dislocated hip as a result of these acts.

During the course of the argument, Madonna Phillips arrived, at the request of Pritchard's three-year-old son. Defendant chased her around to the back of her house, breaking the glass in the back door with his fist and flipping blood from his nose on Phillips as he pursued her. When Pritchard's ex-husband arrived to pick up his son, defendant tried to start a fight with him.

Larry Crider then arrived, and defendant asked him where Law was. Crider replied that Law was at home. Law lived with Madonna and Ace Phillips. Pritchard then called Crider into her home and told him that defendant had beaten her and told her he was going to kill Law and Ace Phillips.

Crider then entered the Phillips' house, where defendant and Law were arguing. Law was holding a claw hammer in his hand. Defendant told Law: "Pick up something, ain't got guts enough to use it. If I picked up something, I'd have guts enough to use it." Law replied: "I don't want no trouble, I just want you gone." Law walked around defendant and out the front door.

Crider then went to Pritchard's home, and the two left to try to find Madonna Phillips. As they got into Crider's car, defendant was still following Law, trying to pick a fight with him. Before they left, they saw Law go back into the house. Defendant stopped in front of the house and shouted at them that they could call the law if they wanted to. He then proceeded into the house.

Unable to find Madonna Phillips, Crider took Pritchard to her brother's house and returned to the Phillips' house. Defendant met Crider as he arrived and said that he had just stabbed Law. Crider found Law lying on his bed with four stab wounds: two in his chest, one in the abdomen, and one in the side. Law was later pronounced dead at the hospital. Defendant's blood-covered knife was found in its sheath on his belt.

Defendant testified at trial that he stabbed Law in self-defense as Law attempted to hit him with the claw hammer. Expert testimony established that Law's

blood-alcohol level at the time of his death was .15 percent. Defendant's was approximately .11 percent.

Trial by jury resulted in convictions for both the first-degree murder of Law and the aggravated assault of Pritchard. After an aggravation-mitigation hearing, the trial judge sentenced defendant to consecutive terms of imprisonment of seven and a half years on the assault count and life on the murder count. Defendant raises the following issues on appeal:[1]

(1) Was defendant denied equal protection of the law when the trial judge refused to apply the anti-marital fact privilege to preclude incriminating testimony by Kimberly Pritchard;

(2) Did the trial court improperly admit into evidence defendant's pistol and testimony concerning other bad acts involving the pistol;

(3) Was a piece of concrete erroneously admitted into evidence;

(4) Did the trial court err by refusing to instruct the jury on voluntary manslaughter and on the failure of the state to produce evidence peculiarly within its power to produce;

(5) Was defendant denied the effective assistance of counsel;

(6) Did the trial court abuse its discretion by denying defendant's motion for a new trial based on insufficiency of the evidence;

(7) Was defendant's sentence for murder correct; and

(8) Were the sentences imposed upon defendant excessive because they were consecutive rather than concurrent?

1. In addition to the brief submitted by appellate counsel, defendant has submitted a supplemental brief in propria persona. We have considered the issues raised by both briefs.

2. Defendant maintains that his relationship with Kimberly Pritchard was a "de facto" marriage by virtue of his having moved into the apartment which she had previously established as a home for herself and her young son; having lived with her for approximately six weeks; having had a sexual relationship with her; having at one time contributed $100 toward their living expenses; having once gone

## ANTI–MARITAL FACT PRIVILEGE

By pre-trial motion and at the time of trial, defendant moved to suppress the testimony of Kimberly Pritchard which dealt with the murder charge, asserting that such testimony falls within the proscription of Arizona's anti-marital fact privilege. His requests were denied, and Pritchard testified about defendant's statement to her the afternoon of Law's death: "I am going to kill Junior and I am going to kill Ace as soon as they come home."

The anti-marital fact statute, A.R.S. § 13–4062, provides:

"A person shall not be examined as a witness in the following cases:

"1. A husband for or against his wife without her consent, nor a wife for or against her husband without his consent, nor can either, during the marriage or afterwards, be, without consent of the other, examined as to any communication made by one to the other during the marriage."

Defendant admits that § 13–4062, by its very language, is applicable only to ceremonially married individuals and that common-law marriages are not recognized in Arizona. A.R.S. § 25–111. He contends, however, that the statute's nonapplicability to individuals, who, like himself, live together in a de facto marriage[2] is violative of the Fourteenth Amendment's equal protection guarantee.

The thrust of defendant's argument seems to be that the same policy consideration of protecting the marital relationship which underlies the application of the privi-

to Mexico with her with the intent to find a minister to marry them, although they were unsuccessful; and Pritchard's having once attempted to have her name changed to Watkins on her employment records so that defendant could obtain a phony driver's license.

We note, however, that the testimony at trial of both defendant and Pritchard clearly indicated that neither considered themselves married nor did they hold themselves out to be married. We, nevertheless, address the equal protection issue as though defendant's relationship were, in fact, a "de facto" marriage.

lege to formally married persons, *see State v. Whitaker,* 112 Ariz. 537, 544 P.2d 219 (1975), should operate to extend the privilege to "quasi" married persons. He contends that to be constitutional, this disparity in the treatment of married persons and "quasi" married persons must be shown to be necessary to promote a compelling state interest, because the disparity burdens the exercise of a constitutional right. *See, e. g., Shapiro v. Thompson,* 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969). Specifically, defendant claims that denying him the anti-marital fact privilege burdened his right to a fair trial.

 We do not agree. The anti-marital fact privilege exists by virtue of legislative fiat, as a matter of policy to protect certain interests. *See United States v. Hicks,* 420 F.Supp. 533 (N.D.Tex.1976). Extension of the privilege to "de facto" marriages is unrelated to meeting constitutional requirements for a fair trial, and, similarly, refusal to apply the privilege in no way burdens the right to a fair trial.

 Because the disparity in treatment does not burden the exercise of a constitutional right, its necessity to promote a compelling state interest need not be shown. Instead, the classification must merely bear a rational relationship to a legitimate state goal in order to pass constitutional muster on equal protection grounds. *See, e. g., Weinberger v. Salfi,* 422 U.S. 749, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975); *State v. Leeman,* 119 Ariz. 459, 581 P.2d 693 (1978); *Eastin v. Broomfield,* 116 Ariz. 576, 570 P.2d 744 (1977).

 We view as a legitimate goal the state's interest in limiting application of the anti-marital fact privilege to those whose relationships are worthy of protection. *Cf. Weinberger v. Salfi, supra.* Even assuming, *arguendo,* that de facto marriage is

equally worthy of protection,[3] the limitation of the privilege to marriages which have been created by the statutorily prescribed formalities is rationally related to the state's interest in preventing the extension of the privilege to less permanent relationships. The administrative difficulty of defining and determining which relationships are to be considered de facto marriages, rather than casual alliances, is obvious. Such a determination would necessitate a case by case qualitative and quantitative analysis of such factors as intimacy, voluntary commitment, stability and psychological involvement. *Cf. Developments in the Law—The Constitution and the Family,* 93 Harv.L.Rev. 1157, 1291 (1980).

We conclude that the limitation of the anti-marital fact privilege to those who are formally married is rationally related to both the state's interest in extending the privilege only to those whose relationships warrant protection as well as to the state's interest in the orderly administration of its laws. *Cf. Califano v. Boles,* 443 U.S. 282, 99 S.Ct. 2767, 61 L.Ed.2d 541 (1979); *Developments in the Law—The Constitution and the Family,* 93 Harv.L.Rev. 1157, 1294 (1980).

## ADMISSION OF DEFENDANT'S PISTOL AND TESTIMONY OF OTHER BAD ACTS

 Defendant contends that the trial court should not have admitted defendant's pistol into evidence and that it improperly permitted Kimberly Pritchard to testify about two occasions when defendant fired it. One such occasion was during the altercation between defendant and Pritchard which formed the basis for the aggravated assault charge. A description of the firing of the pistol was necessary to complete the narrative of the aggravated assault, and it was, therefore, admissible. *State v. Rein-*

**3.** Apparently, the Arizona Legislature would disagree with this assumption. It has refused to recognize common-law marriage, *see* A.R.S. § 25–111, and has made open and notorious cohabitation a misdemeanor. A.R.S. § 13–1409. At any rate, we agree with the California Court of Appeals, that "[i]t is for the legis-lature to determine whether such relationships, because of their commonness in today's society or for other policy reasons, deserve the statutory protection afforded the sanctity of the marriage union." *People v. Delph,* 94 Cal.App.3d 411, 416, 156 Cal.Rptr. 422, 425 (1979).

*hold,* 123 Ariz. 50, 597 P.2d 532 (1979). Because Pritchard's testimony about the pistol was admissible, the gun itself was also admissible to explain her testimony.

■ Pritchard also testified that defendant had fired his pistol during an incident that had occurred several weeks prior to the instant offenses. Her testimony was elicited by the state on redirect examination after she had stated during cross-examination that defendant was acting erratically at the time he assaulted her. On redirect she was asked if she had seen defendant behave in a similar manner when he was not drunk. Pritchard answered that she had and, over defendant's objection, was permitted to describe the incident.

Pritchard stated that defendant had come into her apartment when she and Larry Crider were seated within. Pritchard described defendant as having "a really strange look on his face." He took his pistol off the wall and locked himself in the bathroom. He then crawled out of the bathroom window and came back in the apartment through the front door. He pointed the pistol at Crider and at Pritchard and said "I don't know which one of you sons-of-a-bitches to shoot first." He then fired a shot into the refrigerator.

Rule 404(b), Rules of Evidence, 17A A.R.S., states that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of * * * intent * * *." The state argues that since defendant attempted to show he did not have the requisite specific intent to commit the crimes in question due to intoxication, the prosecution could introduce evidence that defendant had acted in a similar manner in the past when he was not intoxicated. This evidence, the state contends, tends to demonstrate that defendant did have the intent to commit the crimes and that he was not influenced by intoxication. This use of evidence of other bad acts is simply another way of showing that defendant acted in conformity with an aggressive and violent character, the very purpose which is forbidden by Rule 404(b). Pritchard's testimony concerning the prior shooting incident should not have been admitted.

We do not, however, believe that the trial court's error requires that we reverse. The conduct of defendant in the prior incident was far less egregious than it was on the day of the offenses. We note that Pritchard had earlier stated that defendant was a very good shot with the pistol and, therefore, it is reasonable to infer that defendant did not intend to shoot either Crider or Pritchard in the prior shooting occurrence. No mention of the prior incident was made in either opening or closing arguments. Any prejudice that the testimony of this incident caused defendant was minimal, and we find that its erroneous admission was harmless beyond a reasonable doubt.

## ADMISSION OF THE PIECE OF CONCRETE

■ Defendant argues that a piece of concrete was inadmissible because it was not one of the actual ones used to strike Kimberly Pritchard. He also contends that because the piece of concrete was large it was likely to prejudice the jury. "A weapon similar to that used to commit the crime may be introduced in evidence as illustrative of the weapon which the defendant used to assault his victim." *State v. Mays,* 7 Ariz.App. 90, 92, 436 P.2d 482, 484 (1968). Pritchard testified that the piece of concrete was of the same substance but not the same size as the ones used by defendant. It was smaller than one of the actual pieces of concrete used but larger than the other. The piece of concrete in question was relevant and helpful to the jury in determining whether the actual ones used were deadly weapons or dangerous instruments for purposes of A.R.S. § 13–1204 A (2), defining aggravated assault.

## EFFECTIVE ASSISTANCE OF COUNSEL

■ Defendant claims that he received ineffective assistance of counsel because of his attorney's failure to request that a tran-

script of opening and closing arguments be made. We ordered transcripts of the arguments to be prepared, and we find no basis for a claim of error. There was no ineffective assistance in this respect.

■ Defendant also asserts that his attorney was incompetent because he did not request that the jury be sequestered after it had begun its deliberations. The jury began deliberating at 4:15 p.m. on March 25, 1979. At 10:40 p.m. the jury was permitted to separate for the night and to recommence deliberating at 9:30 a.m. on March 26. A verdict was reached at 10:30 a.m. on March 26.

■ We note initially that sequestration is not a right to be granted upon defendant's request, but is a matter left to the discretion of the trial court. 17 A.R.S., Rules of Criminal Procedure, Rule 22.1(b). The Comment to Rule 22.1(b) states that "[c]ases in which a fair verdict would be endangered by permitting the jurors to disperse are rare." We do not find that this case presented one of those rare instances requiring sequestration. Although defendant speculates that the jurors were improperly influenced during the time that they were separated, there is nothing in the record to indicate that this was the situation. Since there was no reason that sequestration should have been granted, we find no ineffective assistance of counsel in not requesting it.

## JURY INSTRUCTIONS

### A. Manslaughter

■ Defendant challenged the trial court's refusal to give his requested instruc-

tion on voluntary manslaughter.[4] We note initially that the present Criminal Code does not divide manslaughter into voluntary and involuntary manslaughter. Defendant's requested instruction was based on only one aspect of manslaughter as defined under the present Criminal Code. A.R.S. § 13–1103 provides:

"A. A person commits manslaughter by:

"1. Recklessly causing the death of another person; or

"2. Committing second degree murder as defined in § 13–1104, subsection A upon a sudden quarrel or heat of passion resulting from adequate provocation by the victim; or

"3. Intentionally aiding another to commit suicide; or

"4. Committing second degree murder as defined in § 13–1104, subsection A, paragraph 3, while being coerced to do so by the use or threatened immediate use of unlawful deadly physical force upon such person or a third person which a reasonable person in his situation would have been unable to resist."

The facts in the present case do not warrant an instruction on manslaughter committed upon a sudden quarrel or in the heat of passion pursuant to A.R.S. § 13–1103 A (2). There was no evidence that defendant stabbed Law in the heat of passion or upon a sudden quarrel which arose while the two were in the Phillips' house. The evidence indicates that the argument between them had been going on all day, that defendant had a lengthy cooling off period, and that

4. The instruction requested by defendant provided as follows:

"Voluntary Manslaughter

"Voluntary manslaughter is the unlawful killing of a human being *without* malice. A killing is without malice if there is no deliberate intent to kill, or if there is no reckless disregard for human life. Another way of defining voluntary manslaughter is: 'a killing resulting from a sudden quarrel or in the heat of passion.' Voluntary manslaughter *has three elements.*

"(1) The defendant must have been provoked by circumstances that would cause a reasonable man to act violently; *and*

"(2) The defendant must in fact have been in the heat of passion at the time of the killing; *and*

"(3) There must *not* have been a cooling off period between the provocation and the killing. A cooling off period is the time it would take for a reasonable man to stop acting violently under the circumstances.

"If you determine beyond a reasonable doubt that the defendant killed the victim, and that the killing was unlawful, but you *have* a reasonable doubt whether the crime is murder or voluntary manslaughter, you must find it is voluntary manslaughter."

the provocation for this altercation was inadequate.

Defendant contends that past cases of this Court hold that a manslaughter instruction must be given where there is evidence of defendant's intoxication. Those cases, all based on §§ 13–455 and 456 of the old Criminal Code in effect prior to the instant offenses, were explained in *State v. Morales*, 120 Ariz. 517, 587 P.2d 236 (1978). *Morales* held that intoxication did not necessitate a manslaughter instruction under §§ 13–455 and 456 if the killing was not committed upon a sudden quarrel or in the heat of passion.

Whether evidence of a defendant's voluntary intoxication might ever warrant a manslaughter instruction based on a theory that he recklessly caused the death of another person pursuant to present A.R.S. § 13–1103 A (1) we need not decide. Defendant did not request such an instruction, and he was not entitled to it since he had clearly committed at least second-degree murder and not voluntary manslaughter.

A.R.S. § 13–1104 defines second-degree murder as follows:

"A. A person commits second degree murder if without premeditation:

"1. Such person intentionally causes the death of another person; or

"2. Knowing that his conduct will cause death or serious physical injury, such person causes the death of another person; or

"3. Under circumstances manifesting extreme indifference to human life, such person recklessly engages in conduct which creates a grave risk of death and thereby causes the death of another person."

Although defendant's intoxication might negate intentional or knowing behavior, he would still have been acting recklessly.[5] The undisputed fact that defendant stabbed the victim four times manifests such an extreme indifference to human life that the homicide would still be second-degree murder under A.R.S. § 13–1104 A (3). We find that a voluntary manslaughter instruction was not required in this case.

### B. Failure to Produce Evidence

Defendant also sought, and was denied, the following jury instruction:

"If you find that the State of Arizona has failed to produce evidence from any source that is peculiarly within its power to provide and the contents and/or quality of that evidence are crucial to the defense, you may presume that because the evidence was not produced, its results would have been unfavorable to the State of Arizona."

Defendant contends that he was entitled to the above instruction because of the state's failure to obtain proper blood and fingerprint analysis of a claw hammer and a sledge hammer found at the murder scene.

In *State v. Willits*, 96 Ariz. 184, 393 P.2d 274 (1964), this Court held that a similar instruction should have been given where potentially exculpatory evidence had been destroyed by the state. We have also held that an inference against the state is inappropriate where the destroyed evidence is of no evidentiary value whatsoever. *State v. Garrison*, 120 Ariz. 255, 585 P.2d 563 (1978).

In the instant case, a criminalist for the state testified that there was no blood, hair or tissue on the claw hammer. Although he did determine the existence of a small speck of human blood on the sledge hammer, he was unable to identify the blood type because of the insufficiency of the sample. This failure of the state to identify the blood type cannot be equated with destruction of the evidence or failure to provide evidence within its power to provide.

---

5. A.R.S. § 13–105(5)(c) states as follows:

" 'Recklessly' means, with respect to a result or to a circumstance described by a statute defining an offense, that a person is aware of and consciously disregards a substantial and unjustifiable risk that the result will occur or that the circumstance exists. * * * A person who creates such a risk but is unaware of such risk solely by reason of voluntary intoxication also acts recklessly with respect to such risk." Voluntary intoxication, therefore, cannot negate the element of recklessness.

It is true that neither hammer was examined for fingerprints. The existence of the victim's fingerprints on the hammers, however, was not crucial to defendant's case, despite defendant's contrary allegation. Larry Crider testified that the victim had a claw hammer in his hand at one point during his argument with defendant. Defendant's assertion that the victim had a hammer in his hand was, thus, undisputed by the state. Moreover, defendant would not have benefitted if the victim's fingerprints had been found on either or both of the hammers for still another reason. Because both hammers were found in the victim's house, proof that his fingerprints were upon them would merely have established that at some time he had touched the hammers, not that he had attempted to strike defendant with them. Thus, proof that the victim's fingerprints were upon one or both hammers would have been of no evidentiary value to defendant, and the trial court correctly refused the proposed instruction.

## DENIAL OF MOTION FOR NEW TRIAL

■ After conviction, defendant moved for a new trial because the verdict of first-degree murder was contrary to the weight of the evidence. Defendant now claims that the trial court erroneously denied that motion. In particular he claims that there was insufficient proof of premeditation. A denial of a motion for a new trial is reversed only when there is an affirmative showing that the trial court abused its discretion and acted arbitrarily. *State v. Durham*, 111 Ariz. 19, 523 P.2d 47 (1974).

■ We find there was substantial evidence of premeditation, and the trial court, therefore, did not abuse its discretion. We specifically cite defendant's continuous aggressive and abusive conduct toward the victim during the course of the day, coupled with his statement to Pritchard that he intended to kill Law. We also note the existence of substantial evidence negating defendant's assertions of intoxication and self-defense.

## INCORRECT SENTENCE

■ Defendant was sentenced to a term of imprisonment "for the term of his natural life on the charge of first-degree murder * * *." Defendant correctly points out that this sentence is not the one provided by the relevant statute, A.R.S. § 13–703 A. Pursuant to our power under A.R.S. § 13–4037 A, defendant's sentence for first-degree murder is hereby modified to a term of imprisonment in the custody of the department of corrections for life, without possibility of parole until the completion of twenty-five calendar years.

## EXCESSIVE SENTENCE

■ Defendant finally challenges his sentences as excessive, because they are to be served consecutively rather than concurrently. He seeks modification pursuant to A.R.S. § 13–4037(B).

This Court, on numerous occasions, had delineated the considerations relevant to scrutiny under § 13–4037(B). *See, e. g., State v. Patton*, 120 Ariz. 386, 586 P.2d 635 (1978); *State v. Herrera*, 121 Ariz. 12, 588 P.2d 305 (1978), *cert. denied*, 441 U.S. 949, 99 S.Ct. 2175–76, 60 L.Ed.2d 1054 (1979). Suffice it to say that, in defendant's case, there are no unusual circumstances to mitigate a severe sentence. Furthermore, we share the trial court's concern for restraint of this defendant who, a prison escapee at the time of the instant offenses, violently assaulted the young woman with whom he was living and stabbed to death one of his friends for no apparent reason. Under these circumstances, the trial court clearly did not abuse its discretion in imposing consecutive rather than concurrent sentences.

The judgments and sentences are affirmed as modified.

STRUCKMEYER, C. J., HOLOHAN, V. C. J., and HAYS and CAMERON, JJ., concur.