STATE OF NEBRASKA, APPELLEE, V.
RENAE N. MCDANIEL, APPELLANT.
667 N.W.2d 259

Filed August 5, 2003. No. A-02-1436.

James R. Mowbray and Nancy K. Peterson, of Nebraska Commission on Public Advocacy, for appellant.

Jon Bruning, Attorney General, and Kevin J. Slimp for appellee.

IRWIN, Chief Judge, and SIEVERS and CARLSON, Judges.

SIEVERS, Judge.

After 1-year-old Johnathan W. sustained severe skull fractures, his mother, Renae N. McDaniel, was charged with child abuse under Neb. Rev. Stat. § 28-707(1)(a) (Cum. Supp. 2002). Renae was found guilty by a jury of knowingly and intentionally causing or permitting Johnathan to be placed in a situation dangerous to his health. Renae appeals on several grounds, including that she was entitled to an instruction on the lesser-included offense of negligent child abuse.

## FACTUAL BACKGROUND

Johnathan was born on November 22, 1999. He lived with Renae in Missouri until September 2000. Then Renae's mother, Cathleen Blanton, brought Renae's children, Johnathan and 4-year-old Patricia M., to live with Cathleen in Palisade, Nebraska.

Renae and her boyfriend, Shawn West, moved to Nebraska around November 18. Cathleen, Andre Crespin (Cathleen's boyfriend), Shawn, Renae, Patricia, Johnathan, and Renae's younger brother, Shane Blanton, all lived in the same residence in Palisade.

Renae did not testify at trial, thus the following account of the events at issue comes from other witnesses and includes statements that Renae made to investigators and that were admitted into evidence at trial.

On November 22, 2000, Johnathan's first birthday, Shawn took Renae to work at approximately 3 p.m. At approximately 5 p.m., Shawn came to Renae's workplace and told her that Johnathan was being taken to the hospital in McCook because he was lethargic, his lips had turned blue, and his eyes had rolled back in his head. Renae went to the hospital. Nurse Darcie Johnson testified that at the hospital, she attempted to obtain a history, and that in response, Renae "threw up her hands and said, 'Don't ask me. I wasn't there.'" The family told Johnson that Johnathan could not have bumped his head because he was in a playpen and that he could not have gotten anything stuck in his throat or ingested any medications or chemicals. Johnson testified that Johnathan was not in any acute distress and that he was alert, awake, and "normal appearing." Johnathan did not cry when Johnson ran her fingers through his hair. Dr. Corinne Phillips-Ward examined Johnathan but could not determine what was wrong with him. She stated that Johnathan might have food poisoning or the flu. Renae, Shawn, and Shane took Johnathan back to Palisade.

Between November 22 and 26, 2000, Johnathan was somewhat better, but he still was not eating well. On November 25, Renae went to work and got off at 4 p.m., but Shawn and Shane did not arrive to pick her up from work until 8 p.m., when Shawn took Renae and Shane to their grandmother's house in McCook. Shawn told her that he would return, but he did not. Renae and Shane stayed at their grandmother's house until approximately 2 a.m. on November 26 and then asked for a ride back to Palisade. Shane testified that Renae was mad because Shawn had not returned to pick them up.

When Renae arrived at the Palisade residence, she observed Cathleen lying on the couch either asleep or partially asleep.

Renae went into her bedroom, which she shared with Shawn and her two children, and checked on Johnathan and Patricia. Johnathan was sleeping in a playpen, and he appeared fine. Shawn was not at the residence, so Renae and the two children were the only people in the bedroom. At some point in the morning, Renae got up to let Patricia out of the bedroom, because the bedroom door was secured by hasps on both sides of the door. Renae and Johnathan remained in the bedroom until around 6 p.m. Shortly before noon, Johnathan started vomiting and became lethargic. Renae attempted to feed Johnathan dry cereal and Sprite. Renae told Officer Dennis Leonard that Johnathan drank the Sprite by himself. At about 2 p.m., Renae tried to feed Johnathan toast. Johnathan apparently chewed on and then spit out his food.

Shortly before 6 p.m., Shawn came into the bedroom and told Renae that he thought there was something wrong with Johnathan. Renae took Johnathan to the kitchen and asked Cathleen to look at him. Cathleen determined that they should take him to the hospital, which they did.

At the hospital in McCook, Dr. John Grove examined Johnathan at roughly 9 o'clock that night and found him "poorly responsive," staring, and unable to focus. As Grove brought his finger around Johnathan's skull, Grove's fingers "fell away into a deep depression." Grove felt a firmness underneath, which he said was Johnathan's brain. Grove testified that he had felt such an injury only one time before, when someone had been run over by a semi-trailer truck. He testified that any blow to the head that would shatter Johnathan's skull must have been "considerable," especially because a baby's bones are softer and more difficult to shatter than an adult's.

While Johnathan was in the hospital's emergency department, Grove saw a progression of swelling and bruising starting to develop over the back of Johnathan's head. According to Grove, this meant that the injuries had happened just a short while before, probably within 4 to 8 hours. According to Grove, if Johnathan had been playing with his food earlier that day, he probably had not yet sustained the trauma. Grove testified that the swelling, but not the fracture, could have resulted from exacerbation of an earlier injury. Grove also found two older areas of bruising above Johnathan's ears. At the hospital, Renae told a detective with the

McCook Police Department that when Renae came to Nebraska around November 18, 2000, Johnathan had a lump on the back of his head and would "jump" every time he was touched.

Grove testified that he believed that the skull fractures resulted from child abuse. He testified that simply falling off a crib or a changing table would not result in this type of isolated head injury. After examining Johnathan, Grove asked the adults with Johnathan who had hurt the baby, and then Renae began accusing Cathleen of doing something to Johnathan or letting something happen to him. Grove asked Patricia what had happened, and she said that Andre had hit Johnathan repeatedly in the head with a telephone receiver because he was crying.

Grove ordered a CAT scan and also began looking at the availability of a helicopter for transferring Johnathan to another hospital. The scan showed a significant fracture from the back of the head to the side of the head. Grove believed that Johnathan's injuries were life threatening and that he probably had some brain damage.

Dr. Deann Psota was the pediatrician on call at Good Samaritan Hospital in Kearney on November 27, 2000. She testified that Johnathan arrived at the hospital from McCook via helicopter between 1 and 2 a.m. on November 27. Upon arrival, Johnathan was very pale and quiet and was lying still with his eyes shut. Psota testified that after an examination, Johnathan received a transfusion due to low hemoglobin (through his head injury he had lost blood, which had collected under his scalp) and was admitted to the intensive care unit for observation of his neurological status. According to Psota, Johnathan had received a severe, significant trauma to the head and such trauma was consistent with child abuse.

Dr. Adeleke Badejo also examined Johnathan at Good Samaritan Hospital. Badejo testified that the CAT scan showed at least four fractures on Johnathan's skull and that those sites were not contiguous. In addition, Badejo testified that an ophthalmologist looked at Johnathan's eye and found hemorrhages in the fondant, which indicates significant injury to the brain.

Badejo, like Grove, testified that if Johnathan had been drinking unassisted or playing with his food at around noon on November 26, 2000, he would not yet have experienced the

trauma which was found. Badejo testified that the injuries had occurred within 24 hours of his examination and that they must have resulted from child abuse. Badejo testified that he told an investigator that the injuries were consistent with being hit on the head with a telephone handset or any other number of things. He testified that the skull fractures were not caused by shaking or slapping.

Valerie Gartner, a protection and safety supervisor for the Nebraska Department of Health and Human Services, interviewed Patricia, who told Gartner that both Patricia and Johnathan got spankings from everyone but Cathleen. Patricia told Gartner that Andre spanked Johnathan in the head to make him go to sleep. Gartner said that she determined the children were not safe with their family and arranged foster placement. The foster parent, who picked Johnathan up from the hospital when he was released, testified that since then, Johnathan had undergone five surgeries, and that his head was still very swollen and sensitive. According to the foster parent, Johnathan's hand still trembles, making it difficult for him to perform tasks.

## PROCEDURAL BACKGROUND

Renae was charged with one count of child abuse in violation of § 28-707(1)(a) and (5), a Class III felony. The allegation was that Renae did "[k]nowingly and intentionally cause or permit a minor child . . . to be placed in a situation that endangered said minor child's life or physical or mental health resulting in serious bodily injury."

Renae's attorney requested a jury instruction for the lesser-included offense of negligent child abuse, a Class I misdemeanor. The State objected, citing *State v. Parks*, 5 Neb. App. 814, 565 N.W.2d 734 (1997) (*Parks I*), in which we held that an instruction for negligent child abuse was not appropriate where there was no evidence of a negligently inflicted injury according to the medical evidence. As we discuss later in our opinion, our decision was overruled in 1998 by the Nebraska Supreme Court. See *State v. Parks*, 253 Neb. 939, 573 N.W.2d 453 (1998) (*Parks II*).

The trial court in the instant case found that the evidence showed that the child abuse was intentional, stating, "There just is no question there is no evidence of any negligent injury that

occurred to this child under these circumstances." The court refused to give the lesser-included offense instruction.

## ASSIGNMENT OF ERROR

Renae assigns three errors, but we need discuss only one—the failure to give to the jury the lesser-included offense instruction on the crime of negligent child abuse.

## ANALYSIS

Renae argues that the trial court should have given to the jury her proposed jury instruction on negligent child abuse, which proposal read:

R.S. 28-707 (1) (3) [sic] A person commits child abuse if he or she knowingly, intentionally, or negligently causes or permits a minor child to be (A) placed in a situation that endangers his or her health. (3) Child abuse is a Class I misdemeanor if the offense is committed negligently.

■ To establish reversible error from a court's refusal to give a requested instruction, an appellant has the burden to show that (1) the tendered instruction is a correct statement of the law, (2) the tendered instruction is warranted by the evidence, and (3) the appellant was prejudiced by the court's refusal to give the tendered instruction. *Parks II.*

■ Renae's proposed instruction quotes § 28-707 verbatim, except it leaves out the words "life or physical or mental" before "health." Essentially, the instruction repeats the statute; however, inclusion of subsection (3) in the instruction, which defines negligent child abuse as a misdemeanor, gives us pause. As noted in the comment to NJI2d Crim. 9.5, "Nebraska law is clear that the jury should not be told the potential punishment for a crime because that information is not relevant to a decision to convict or acquit." See, also, *State v. Nelson*, 182 Neb. 31, 152 N.W.2d 10 (1967); *Ford v. State*, 46 Neb. 390, 64 N.W. 1082 (1895). While the unnecessary portion of the proposed instruction in this case classifies the crime without discussing penalties, it may nonetheless lead the jury to speculate about the potential punishment for negligent child abuse as opposed to intentional abuse. Thus, this language would be better excluded, but as will be explained later, the actor's state of mind is an element of the charge, plus it determines the grade of the offense. Thus, the jury

must be instructed to make a specific finding on the actor's intent, i.e., negligent or intentional. Nonetheless, this shortcoming in the proposed instruction does not affect our analysis of Renae's entitlement to a lesser-included offense instruction, because she asked that the issue of negligent abuse be submitted to the jury. In any event, it is the duty of a trial judge to instruct the jury on the pertinent law of the case, whether requested to do so or not. *State v. Dixon*, 259 Neb. 976, 614 N.W.2d 288 (2000).

■ A court must instruct on a lesser-included offense if (1) the elements of the lesser offense for which an instruction is requested are such that one cannot commit the greater offense without simultaneously committing the lesser offense and (2) the evidence produces a rational basis for acquitting the defendant of the greater offense and convicting the defendant of the lesser offense. *Id.*

While acknowledging that using the statutory elements test, negligent child abuse is a lesser-included offense of knowing or intentional child abuse, see *Parks II*, the trial court in the instant case refused the lesser-included offense instruction because it found no evidence of any "negligent injury" to the child. But the trial court's reasoning is incorrect in several respects. First, Renae was not charged with infliction of the injury ("cruelly punished" under § 28-707(1)(b)), but with causing or permitting her child to be placed in an endangering situation. Under such charge, there could be "negligent" placement and "intentional" infliction of the injury by someone else. Thus, even if the conclusion that there was no evidence that the injury was negligently inflicted was accurate, the rationale for the refusal to give a negligent abuse instruction fails to account for the evidence that Andre was hitting the child on the head with a telephone. Such evidence could lead the fact finder to conclude that there had been a negligent endangering placement coupled with an intentional infliction by someone other than Renae.

Several doctors testified that they believed Johnathan's injuries were a result of child abuse, because such injuries could not be caused by a fall. However, the State seemingly has abandoned its theory that the crime was an endangering placement, because it now argues that the evidence shows that Renae knowingly and intentionally inflicted Johnathan's injuries. This argument rests

almost completely on the opinions of the doctors that the injury occurred in the timeframe during which Renae was locked in the bedroom alone with Johnathan, from about 2:30 a.m. to 6 p.m. on November 26, 2000.

■ This seems an appropriate juncture to mention *State v. Canady*, 263 Neb. 552, 641 N.W.2d 43 (2002), wherein the court determined that a charge of knowingly and intentionally causing or permitting a child to be placed in a situation dangerous to his or her health may be proved by evidence that the defendant actually inflicted the injury. *Canady, supra*, involved the same charges as those against Renae in the instant case. In *Canady*, the defendant admitted to putting his child in the bathtub and the medical evidence showed that to sustain a full thickness burn injury, as the child sustained, the child would have to be held in the water because a child would not remain in such hot water voluntarily. In this way, the "tidemarks" on the skin which are characteristic of being held in hot water are produced. Thus, in *Canady*, the conviction was upheld even though the charge was placement in an endangering situation but the evidence showed that the defendant inflicted the injury himself. *Canady* clearly shows that one charged with child abuse by dangerous placement of a child can be convicted, even if the evidence shows that he or she was the "inflictor" of the child's injury. However, the case did not address whether the evidence warranted an instruction on the lesser-included offense of negligent child abuse. *Parks II* is the seminal case on that issue.

■ In *Parks II*, the medical evidence was that a spiral fracture of the child's femur was not likely to have occurred when the child allegedly got his leg caught in the bars of the crib. By the time of trial, the defendant apparently abandoned the "caught in the crib" explanation and testified that he flipped the child over by the leg to change its diaper and then heard a "popping noise." *Id.* at 943, 573 N.W.2d at 456. He testified that although at the time he had been angry at the child's mother, he did not intend to injure the child. The Supreme Court found that the language found in § 28-707(1) about whether the child is injured "knowingly, intentionally, or negligently" defines the elements of child abuse. Such language appears as well in § 28-707(3) through (6), the subsections which define the range

of penalties. As a result, the *Parks II* court held that the defendant's state of mind is an element of the offense as well as a factor, along with the seriousness of the injury, to be considered in determining the classification of the offense and penalty. From this conclusion the court reasoned that while the medical testimony in *Parks II* led to the inference of an intentional injury, it failed to create an inference as to the defendant's state of mind at the time the injury was inflicted. Therefore, the Supreme Court held that a negligent child abuse instruction should have been given. According to the Supreme Court, "the defendant's state of mind is the only factor which differentiates misdemeanor child abuse from felony child abuse under § 28-707." *Parks II*, 253 Neb. at 948, 573 N.W.2d at 459.

Therefore, the question is not just whether Johnathan's injury was of such severity and nature as to permit only the inference that the injury was inflicted intentionally, but what was Renae's state of mind at the time of injury, assuming for discussion that she did inflict the injury. As the *Parks II* court said, "[I]t is the actor's state of mind which differentiates the offenses. If the abuse is committed knowingly and intentionally, it is a felony; if committed negligently, it is a misdemeanor." *Id.* at 947, 573 N.W.2d at 459. Because of *Canady, supra*, we think this is true irrespective of whether Renae is seen by the fact finder as placing the child in an endangering situation or actually inflicting the injuries herself.

The difficulty here and what distinguishes this case from *Parks II* is that while the State's evidence provides only one rational basis for when the injury occurred—during the 4 to 8 hours before the child was seen by Grove, a time period when Renae and Johnathan were alone in the locked bedroom—there is no evidence of what happened in the bedroom, other than what can be inferentially concluded from the fact of the injury and the medical testimony about the injury. Renae's state of mind, which *Parks II* says is an element of the offense, was not uncontrovertibly established by the State. Significantly, *Parks II* says that where the prosecution has offered uncontroverted evidence on an element necessary for conviction of the greater crime but not necessary for the lesser offense, the defendant has a duty to offer at least some evidence to dispute the issue if he or she wishes to

have the benefit of a lesser-included offense instruction. Accord, *State v. Huebner*, 245 Neb. 341, 513 N.W.2d 284 (1994), *abrogated on other grounds, State v. Morris*, 251 Neb. 23, 554 N.W.2d 627 (1996); *State v. Tamburano*, 201 Neb. 703, 271 N.W.2d 472 (1978). Thus, since there is nothing but inconclusive circumstantial evidence about the events in the bedroom and Renae's state of mind, Renae had no duty to offer any evidence on her state of mind or intent in order to get a lesser-included offense instruction on negligent child abuse.

 *State v. Kipf*, 234 Neb. 227, 450 N.W.2d 397 (1990), in an extensive discussion, makes it clear that where intent is an element of a crime, the defendant is entitled to a trial by jury on such element. See, also, *In re Winship*, 397 U.S. 358, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970) (due process in criminal case requires prosecution to prove beyond reasonable doubt every fact necessary to constitute crime charged against defendant); *Glasgow v. State*, 147 Neb. 279, 22 N.W.2d 842 (1946) (if any of essential elements of crime are omitted from jury instructions, thereby having effect of withdrawing those issues from jury, judgment must be reversed for retrial as neither trial court nor appellate court can substitute for jury in determining whether or not such elements have been established beyond reasonable doubt). Given the holding of *Parks II* that the Legislature has specifically included the defendant's state of mind as an element of the offense of child abuse as well as a factor to be considered in determining the classification of the offense and penalty, the trial court erred in not submitting to the jury the element of Renae's state of mind in the form of a lesser-included offense instruction. Because such failure precluded conviction for a lesser offense, it was obviously prejudicial to Renae. Thus, the conviction is reversed, and the matter is remanded to the district court for a new trial. It is not necessary to discuss Renae's other assignments of error.

REVERSED AND REMANDED FOR A NEW TRIAL.