permitted to clarify Susan's wishes,[6] which he did by asking whether she had questions for him. And when he so inquired, Susan indicated that she did, asking about the autopsy. Susan then willingly answered questions posed by Farber in connection with the coroner's report for the autopsy.

For the above reasons, I would conclude that Susan's statements from 3:43 to 4 a.m. did not need to be suppressed, because Susan did not unambiguously invoke her right to remain silent.

---

[6] See *Berghuis v. Thompkins*, 560 U.S. 370, 130 S. Ct. 2250, 176 L. Ed. 2d 1098 (2010).

---

STATE OF NEBRASKA, APPELLEE, V.
MARQUS J. PATTON, APPELLANT.
___ N.W.2d ___

Filed April 11, 2014.    No. S-13-105.

1. **Constitutional Law: Witnesses: Appeal and Error.** An appellate court reviews de novo a trial court's determination of the protections afforded by the Confrontation Clause of the Sixth Amendment to the U.S. Constitution and article I, § 11, of the Nebraska Constitution and reviews the underlying factual determinations for clear error.

2. **Constitutional Law: Due Process.** The determination of whether procedures afforded an individual comport with constitutional requirements for procedural due process presents a question of law.

3. **Judgments: Appeal and Error.** When issues on appeal present questions of law, an appellate court has an obligation to reach an independent conclusion irrespective of the decision of the court below.

4. **Rules of Evidence: Appeal and Error.** The exercise of judicial discretion is implicit in the determinations of relevancy under Neb. Evid. R. 403, Neb. Rev. Stat. § 27-403 (Reissue 2008), and a trial court's decisions regarding them will not be reversed absent an abuse of discretion.

5. **Rules of Evidence: Other Acts: Appeal and Error.** It is within the discretion of the trial court to determine relevancy and admissibility of evidence of other wrongs or acts under Neb. Evid. R. 404(2), Neb. Rev. Stat. § 27-404(2) (Cum. Supp. 2012), and the trial court's decision will not be reversed absent an abuse of discretion.

6. **Criminal Law: Constitutional Law: Trial: Witnesses.** The right of a person accused of a crime to confront the witnesses against him or her is a fundamental

right guaranteed by the 6th amendment to the U.S. Constitution, as incorporated in the 14th amendment, as well as by article 1, § 11, of the Nebraska Constitution.

7. **Constitutional Law: Trial: Witnesses.** The functional purpose of the Confrontation Clause is to ensure the integrity of the factfinding process through the provision of an opportunity for effective cross-examination.

8. **Constitutional Law: Trial: Witnesses: Words and Phrases.** The right to confrontation means more than merely being allowed to confront the witness physically. But the right is not unlimited, and only guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way and to whatever extent the defense may wish.

9. **Trial: Testimony.** When the object of the cross-examination is to collaterally ascertain the accuracy or credibility of the witness, the scope of the inquiry is ordinarily subject to the discretion of the trial court.

10. **Constitutional Law: Trial: Juries: Witnesses.** An accused's constitutional right of confrontation is violated when either (1) he or she is absolutely prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, or (2) a reasonable jury would have received a significantly different impression of the witnesses' credibility had counsel been permitted to pursue his or her proposed line of cross-examination.

11. **Criminal Law: Due Process: Witnesses.** The existence of an agreement to testify by a witness under threats or promises of leniency made by the prosecutor is relevant to the credibility of such witness, and failure to bring that to the attention of the jury denies the defendant due process of law.

12. **Criminal Law: Witnesses.** An expectation of leniency on the part of a witness, absent evidence of any expressed or implied agreement, need not be revealed to the jury.

13. **Records: Appeal and Error.** A party's brief may not expand the evidentiary record.

14. **Evidence: Records: Appeal and Error.** A bill of exceptions is the only vehicle for bringing evidence before an appellate court; evidence which is not made a part of the bill of exceptions may not be considered.

Appeal from the District Court for Douglas County: J. Michael Coffey, Judge. Affirmed.

Thomas C. Riley, Douglas County Public Defender, for appellant.

Jon Bruning, Attorney General, and Nathan A. Liss for appellee.

Heavican, C.J., Wright, Connolly, Stephan, McCormack, Miller-Lerman, and Cassel, JJ.

STEPHAN, J.

A jury convicted Marqus J. Patton of first degree murder and use of a deadly weapon to commit a felony as a result of his involvement in a fatal shooting which occurred during a home invasion robbery. Two key prosecution witnesses were participants in the crime, and another was the victim's former girlfriend. On appeal, Patton contends the trial court erroneously restricted his cross-examination of these witnesses and otherwise impeded his efforts to impeach them in violation of his constitutional rights of confrontation and due process of law. We conclude there was no reversible error and affirm.

## I. BACKGROUND

On July 6, 2011, Patton was at the home of his friend Nicholas Ely. Also present were Ryan Elseman and Emily G., a juvenile. The group decided to go swimming, and Drake Northrop arrived at around 11:45 a.m. to give them a ride. After setting out in Northrop's vehicle, they decided to stop to buy marijuana from Kristopher Winters before going swimming.

Emily directed the group to Winters' home, where she had been before. She testified that while they were in the car, she heard the others discussing a plan to rob Winters. Northrop testified that it was Ely and Elseman who devised the plan to rob Winters and recalled them saying it would be an easy "lick," a slang term for robbery. Northrop further testified that both he and Patton agreed with the plan.

Northrop parked the car around the corner from Winters' home. Emily went to the door alone and agreed to send a text message to the others when she was inside. While near Winters' home, Emily encountered Winters' friend Eric Brusha. Brusha called Winters on his cell phone, and Winters let Emily and Brusha in the house. Emily then sent a text message to Elseman stating that she was inside.

A few minutes later, Ely, Elseman, Patton, and Northrop entered Winters' home. Elseman and Patton both carried firearms. When Elseman held his weapon up, Winters rushed at Elseman. Patton struck Winters as he fought with Elseman, and then Winters struck Patton with a chair. Patton yelled for

Elseman to shoot, and a gunshot struck Winters in the neck, causing his death. As Winters fell, Ely, Elseman, Patton, and Northrop ran to the parked vehicle. Emily was left behind.

Ely, Elseman, Patton, and Northrop left the scene in Northrop's vehicle. Elseman sent Emily a text message instructing her to go to a nearby restaurant where someone would pick her up. The others went to Patton's apartment. On the way there, Patton stated that a bullet must have grazed him and showed the others a bloody injury on his stomach. DNA testing later showed blood found in Northrop's car was a match for Patton.

Meanwhile, Brusha called the 911 emergency dispatch service and was present at the scene when investigators arrived. An investigating officer escorted Brusha to the police station for an interview. As they drove, Brusha saw Emily walking and identified her as a participant in the incident. Emily was detained and taken to the police station.

Emily had blood spatters on her shirt, leg, and shoes. She initially was uncooperative, but eventually told investigators what happened and showed them where Ely lived. Patton was arrested on the morning of July 8, 2011. Northrop was arrested on July 14. Northrop originally denied involvement, but eventually confessed and implicated Ely, Elseman, Patton, and Emily.

Patton, Emily, and Northrop were all charged with first degree murder. Emily and Northrop agreed to testify against Patton, and many of the facts summarized here came into evidence through their testimony. In addition, Cassandra Moyers, Winters' former girlfriend, testified that 2 days before the robbery, she had been at a party with Ely, Elseman, Patton, and Northrop. At that time, Patton asked Moyers to help him devise a plan to rob Winters, who was a known drug dealer.

Patton was convicted and sentenced to life imprisonment on the murder count and to 5 to 15 years' imprisonment for use of a deadly weapon to commit a felony. He filed this timely appeal. Additional facts will be set forth in our discussion of Patton's specific assignments of error.

## II. ASSIGNMENTS OF ERROR

Patton assigns, restated, renumbered, and consolidated, (1) that the trial court violated his constitutional right to confront the witnesses against him by limiting his cross-examination of Emily, Northrop, and Moyers; (2) that the trial court violated his due process rights by precluding him from presenting evidence that the State had made tacit plea agreements with Emily and Northrop; (3) that the State violated his due process rights by failing to disclose it made such tacit plea agreements; and (4) that the trial court erred in refusing to receive evidence of prior robberies committed by Emily and Elseman.

## III. STANDARD OF REVIEW

[1-3] An appellate court reviews de novo a trial court's determination of the protections afforded by the Confrontation Clause of the Sixth Amendment to the U.S. Constitution and article I, § 11, of the Nebraska Constitution and reviews the underlying factual determinations for clear error.[1] The determination of whether procedures afforded an individual comport with constitutional requirements for procedural due process presents a question of law.[2] When issues on appeal present questions of law, an appellate court has an obligation to reach an independent conclusion irrespective of the decision of the court below.[3]

[4,5] The exercise of judicial discretion is implicit in the determinations of relevancy under Neb. Evid. R. 403, Neb. Rev. Stat. § 27-403 (Reissue 2008), and a trial court's decisions regarding them will not be reversed absent an abuse of discretion.[4] It is within the discretion of the trial court to determine relevancy and admissibility of evidence of other wrongs or acts under Neb. Evid. R. 404(2), Neb. Rev. Stat. § 27-404(2) (Cum.

[1] *State v. Kitt*, 284 Neb. 611, 823 N.W.2d 175 (2012). See, also, *State v. Sorensen*, 283 Neb. 932, 814 N.W.2d 371 (2012).

[2] *State v. Watson*, 285 Neb. 497, 827 N.W.2d 507 (2013).

[3] *State v. Landera*, 285 Neb. 243, 826 N.W.2d 570 (2013).

[4] *State v. Taylor*, 282 Neb. 297, 803 N.W.2d 746 (2011).

Supp. 2012), and the trial court's decision will not be reversed absent an abuse of discretion.[5]

## IV. ANALYSIS

### 1. LIMITATION OF CROSS-EXAMINATION

Patton contends the trial court violated his Sixth Amendment right to confrontation when it limited his ability to cross-examine three prosecution witnesses. Specifically, he argues that the district court erred in restricting him from (1) cross-examining Emily and Northrop about what sentence they hoped to avoid by testifying against him and (2) questioning Moyers about the fact that she believed Winters' family blamed her for his death.

[6-10] The right of a person accused of a crime to confront the witnesses against him or her is a fundamental right guaranteed by the 6th amendment to the U.S. Constitution, as incorporated in the 14th amendment, as well as by article 1, § 11, of the Nebraska Constitution.[6] The functional purpose of the Confrontation Clause is to ensure the integrity of the factfinding process through the provision of an opportunity for effective cross-examination.[7] The right to confrontation means more than merely being allowed to confront the witness physically.[8] But the right is not unlimited, and only guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way and to whatever extent the defense may wish.[9] When the object of the cross-examination is to collaterally ascertain the accuracy or credibility of the witness, the scope of the inquiry

---

[5] *State v. Collins*, 281 Neb. 927, 799 N.W.2d 693 (2011).

[6] *State v. Stark*, 272 Neb. 89, 718 N.W.2d 509 (2006); *State v. Johnson*, 255 Neb. 865, 587 N.W.2d 546 (1998).

[7] *State v. Stark, supra* note 6; *State v. Bjorklund*, 258 Neb. 432, 604 N.W.2d 169 (2000), *abrogated on other grounds, State v. Mata*, 275 Neb. 1, 745 N.W.2d 229 (2006).

[8] *State v. Privat*, 251 Neb. 233, 556 N.W.2d 29 (1996).

[9] *Id*., citing *Delaware v. Van Arsdall*, 475 U.S. 673, 106 S. Ct. 1431, 89 L. Ed. 2d 674 (1986).

is ordinarily subject to the discretion of the trial court.[10] An accused's constitutional right of confrontation is violated when either (1) he or she is absolutely prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, or (2) a reasonable jury would have received a significantly different impression of the witnesses' credibility had counsel been permitted to pursue his or her proposed line of cross-examination.[11]

### (a) Cross-Examination of Emily and Northrop

Because there was limited physical evidence linking Patton to the murder, the testimony of both Emily and Northrop was an important part of the State's case against him. Prior to trial, the State filed a motion in limine to prevent Patton from asking either Emily or Northrop what penalty he or she was seeking to avoid by testifying against him. The trial court sustained the motion, reasoning that because Patton, Emily, and Northrop were all charged with first degree murder, allowing either Emily or Northrop to testify about the possible penalty for that crime would improperly alert the jury to the penalty Patton faced if convicted.

Patton was, however, permitted to cross-examine both Emily and Northrop generally, and rather extensively, about their decisions to testify against him. And both were also asked on direct examination about their decision to testify. Specifically, Emily, who was 15 years of age at the time of the murder, testified on direct examination that she was charged with first degree murder and that she had a "hope or an expectation" that by testifying, she would "get [her case] dropped down to juvenile." She explained, however, that she had not been "told that that is going to happen for sure."

On cross-examination, Emily admitted that she was "trying to save" herself and that to do that, she had to cooperate with

---

[10] *State v. Privat, supra* note 8. See, also, *State v. Banks*, 278 Neb. 342, 771 N.W.2d 75 (2009); *State v. Stark, supra* note 6.

[11] *Id*.

the prosecution. She also admitted that she had told lies to protect herself when she was "in a corner." She again testified that she was charged with first degree murder and explained that she understood that because of the felony murder rule, whoever participates in a murder is charged with the murder. She also testified on cross-examination that it was her understanding that if her case were transferred to juvenile court, she would not go to prison and she would actually be "free and clear" on her 19th birthday. She testified that her desire to get her case transferred to juvenile court had been communicated to the prosecutor only via her testifying against Patton and the other defendants in the case. She admitted that "what happens" to her is the "most important thing that's going on" in her mind and that "[w]hat happens" to her "depends in large part [on] how" she testified.

Northrop testified on direct that he was currently incarcerated and was facing a first degree murder charge related to Winters' death. He stated he was testifying at Patton's trial and had testified before "[i]n hopes to get a deal." On direct examination, he stated he had been promised "[n]othing" in return for his testimony.

On cross-examination, Northrop testified that when he gave his initial statement to police, he wanted to minimize his own involvement and maximize everyone else's to "help [him]self out." He stated that he had told lies under oath and was trying to "save" himself by testifying. He stated he was "hoping" that he would get a benefit from the prosecution, because he had testified against Patton and other persons charged with Winters' murder.

Clearly, Patton was not absolutely prohibited from cross-examining Emily and Northrop with respect to a prototypical form of bias, namely, whether their testimony against Patton was influenced by their desire to receive favorable treatment from prosecutors in their pending murder cases. Thus, the question before us is whether a reasonable jury would have received a significantly different impression of the witnesses' credibility had counsel been permitted to carry the cross-examination one

step further by inquiring as to the specific penalty they faced if convicted of first degree murder.[12]

We applied this test to a limitation on the cross-examination of a prosecution witness who had participated in the crime charged in *State v. Stark*.[13] The witness, Scott McNeill, testified that it was the defendant, Dennis Stark, who struck the fatal blow to the victim's head with a hammer. Stark testified that it was McNeill who struck the blow. Stark was not permitted to cross-examine McNeill regarding his fear of receiving the death penalty and, on appeal, contended that his right to confrontation was thus violated. We found that Stark was permitted to question McNeill about the reduction of charges against him to second degree murder and his concern about getting the death penalty without objection. We determined that this cross-examination "was sufficient to support an argument that McNeill had a motive to confess and testify against Stark"[14] and that thus, it could not be said that the jury would have received a significantly different impression of McNeill's credibility had Stark been permitted to cross-examine him more extensively about his fear of receiving the death penalty.

*Stark* is somewhat distinguishable from the instant case in that neither Emily nor Northrop mentioned the specific penalty for first degree murder at any point in their testimony. Patton urges that we follow the reasoning of the Arizona Supreme Court in *State v. Morales*.[15] In that first degree murder case, the key prosecution witness was a 15-year-old who had been a principal participant in the crime and was testifying at the trial pursuant to a plea agreement. The jury was told that pursuant to the agreement, if the State found the testimony of "'substantial aid'" in its prosecution, it would withdraw its request to

---

[12] See *State v. Privat, supra* note 8. See, also, *State v. Banks, supra* note 10; *State v. Stark, supra* note 6.

[13] *State v. Stark, supra* note 6.

[14] *Id.* at 100, 718 N.W.2d at 520.

[15] *State v. Morales*, 120 Ariz. 517, 587 P.2d 236 (1978).

transfer the witness' then pending juvenile case to adult court and the witness would enter an admission to the charge of second degree murder in juvenile court.[16] The jury was further told that if this occurred, the witness would be subject to the jurisdiction of the juvenile court only until he turned 21 years of age. Defense counsel sought to introduce evidence that if the witness' case had been transferred to adult court, he would have faced the possibility of death or life in prison, but the trial court prevented counsel from doing so, reasoning such evidence would alert the jury to the possible penalty faced by the defendant before it. In reversing the conviction, the Arizona Supreme Court held:

> Whatever merit [the trial court's] reason may have, it cannot outweigh the right of the defendant to cross-examine the State's major witness on what he expects in return for his testimony. The fact that the witness faced a possible death penalty if he did not testify for the State surely would be a factor if not the factor in the witness's decision to testify. The trial court's refusal to allow inquiry into the penalty the witness would have faced had he not agreed to testify was reversible error.[17]

There is authority in Nebraska for the general proposition that jurors need not and should not be told of the punishment faced by a defendant if convicted.[18] We agree with the Arizona Supreme Court that this principle should yield to the right of a defendant to cross-examine a prosecution witness regarding the penalty that he or she is avoiding or seeking to avoid by testifying, even if such cross-examination necessarily discloses the penalty faced by the defendant if convicted.

But this case differs from *Morales* in three key respects. First, Emily and Northrop did not face the death penalty. Second, the jury learned of the potential life sentences Emily and Northrop were facing from another witness. Third, both

---

[16] *Id*. at 519, 587 P.2d at 238.

[17] *Id*. at 520, 587 P.2d at 239.

[18] See, *State v. Nelson*, 182 Neb. 31, 152 N.W.2d 10 (1967); *State v. McDaniel*, 12 Neb. App. 76, 667 N.W.2d 259 (2003). See, also, NJI2d Crim. 9.5.

Emily and Northrop were extensively cross-examined about the benefit they hoped to obtain by testifying.

After both Emily and Northrop had testified, Omaha Police Det. Dan Martin appeared as a prosecution witness. Martin was cross-examined regarding his initial interview with Emily following her arrest. He stated that Emily originally told him that she had gone to Winters' home to purchase marijuana, heard an altercation, and then left. Martin testified that Emily changed her story and described the robbery attempt after he told her that the others were saying she had planned the robbery. This cross-examination included the following exchange:

> [Defense counsel:] And did you tell [Emily] what the consequences would be if she was — you know, if she was responsible for everything?
>
> [Martin:] Yes.
>
> Q. What did you tell her?
>
> A. So that she could be arrested just like everyone else. Life in prison.
>
> Q. Life in prison. So once you told her that she was facing that penalty, what did she do?
>
> A. She told me another version of her story.

Shortly after this, a sidebar conference was held during which the prosecutor argued that "there should be no more mention" of the penalty, and the court replied, "It came out. Now leave it alone." There was no motion to strike the testimony, and the jury was not instructed to disregard it. However, at the State's request, the court directed defense counsel not to refer to Martin's testimony regarding the penalty in his closing argument. Nevertheless, Martin's testimony informed the jury that the penalty for first degree murder faced by Emily (and by necessary implication, Northrop), was life imprisonment; that Emily was aware of this fact long before she testified at trial; and that she changed her story and incriminated Patton and others after learning of the penalty she faced.

In view of Martin's testimony, and considering the cross-examinations of Emily and Northrop in their entirety, we cannot conclude that a jury would have received a significantly different impression of their credibility if counsel had

been permitted to elicit the fact that they faced life sentences for first degree murder. It was abundantly clear from their testimony that they were cooperating with the prosecution in an attempt to obtain favorable treatment on their pending charges, and for no other reason. Both admitted that they were attempting to "save" themselves. Emily admitted that if she did not have any hope of leniency, she would probably not testify. When Northrop was asked if he found himself in the position of "hav[ing] to testify for the prosecutors" in order to achieve his goal of saving himself, he responded, "Hopefully, yes."

Although Patton was not permitted to cross-examine Emily and Northrop regarding the specific sentences they hoped to avoid by testifying for the State, he was permitted to examine them regarding the specific benefit they hoped to obtain. Emily understood that if her case were transferred to juvenile court, she would not go to prison and would be "free and clear" on her 19th birthday, when the juvenile court would no longer have jurisdiction. She agreed that this would be a "pretty good deal" and was hoping that it would happen. Northrop, who had two prior felony convictions, testified that he understood the difference in penalties for the four classes of Nebraska felonies and was hoping that prosecutors would allow him to plead guilty to an accessory offense, for which he could receive as little as 1 or 2 years in prison. Even without knowing the specific penalty for first degree murder, a reasonable juror would understand from this testimony that Emily and Northrop were hoping to obtain a substantial benefit from their cooperation with the prosecution. And the jury was instructed that it was the sole judge of the credibility of the witnesses and could consider, among other things, "[t]heir interest in the result of the suit, if any," and "[t]heir apparent fairness or bias . . . ."

Because the jury learned of the penalty for first degree murder from another witness and because Emily and Northrop were cross-examined extensively on their motivation to obtain leniency from the prosecution by testifying, a reasonable jury would not have received a significantly different impression of

the witnesses' credibility had defense counsel been permitted to ask what specific penalty Emily and Northrop faced. There was no violation of Patton's confrontation right.

### (b) Cross-Examination of Moyers

Moyers was Winters' former girlfriend. She testified on direct examination that 2 days before the robbery, Patton asked her for information about where Winters kept his drugs because Patton wanted to rob Winters. She also testified that after her relationship with Winters ended in December 2010, she remained friendly with his mother, explaining they were together frequently and were "[a]lmost best friends." Moyers testified that she went to Winters' home after she learned of the shooting "[b]ecause I was really close to the family."

On cross-examination, Moyers was asked about her relationship with Winters' family while she was dating him and the frequency of her visits to the Winters' home. When asked about her relationship with Winters' mother, she said it was "good at the time." Patton's counsel then asked, "How is it now?" The court sustained the State's relevancy objection to this question.

At that point, there was a sidebar conference at which Patton's counsel argued he should be able to pursue his inquiry because according to the deposition testimony of an unidentified witness, the Winters' family blamed Moyers for Winters' death, and this gave Moyers a motive to falsify or exaggerate her testimony against Patton. The prosecutor argued that Moyers' current relationship with Winters' family was irrelevant. The court again sustained the objection. There was no offer of proof.

Because Patton was not completely prevented from cross-examining Moyers regarding a possible bias stemming from her relationship with Winters' family, the restriction on cross-examination must be assessed under the second prong of the test in *State v. Privat*.[19] Patton argues that Moyers believed

---

[19] See *State v. Privat, supra* note 8.

that Winters' family blamed her for his death and that "this belief, whether accurate or not, is a motive for the witness to exaggerate her knowledge of the situation in an effort to assuage the feelings of the Winters family."[20] This inference is somewhat tenuous, and the record does not include any evidentiary showing that Moyers held this belief. A stronger inference of Moyers' potential bias against Patton can be drawn from her testimony that she had a close relationship with Winters' family both during the time that she dated Winters and after they broke up. This evidence gave Patton a basis for arguing that Moyers had a personal bias in favor of Winters' family and thus a motive to assist the prosecution. We cannot conclude that a reasonable jury would have had a significantly different impression of her credibility had it known that Moyers believed that Winters' family blamed her for his death, and thus, there was no violation of Patton's confrontation rights.

## 2. TACIT PLEA AGREEMENTS

Patton contends that the State made tacit plea agreements with Emily and Northrop whereby they would receive a reduction in charges and, in Emily's case, a transfer to juvenile court in exchange for their testimony. He contends that his due process rights were violated by the trial court's ruling that he could not present evidence from the attorneys for Emily and Northrop with respect to such agreements or an understanding not to reach plea agreements prior to trial. And he contends that the State's failure to disclose the purported agreements violated his due process rights as articulated in *Brady v. Maryland*[21] and *United States v. Bagley*.[22]

[11,12] The existence of an agreement to testify by a witness under threats or promises of leniency made by the prosecutor is relevant to the credibility of such witness, and failure to bring that to the attention of the jury denies the defendant

---

[20] Brief for appellant at 48.

[21] *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963).

[22] *United States v. Bagley*, 473 U.S. 667, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985).

due process of law.[23] An expectation of leniency on the part of a witness, absent evidence of any expressed or implied agreement, need not be revealed to the jury.[24]

### (a) Attorney Testimony

As noted, both Emily and Northrop testified that they hoped for favorable consideration from the State in exchange for their testimony. Both also testified they had not been promised or assured that they would receive it. In other words, both denied that they had entered into any plea agreement with the State. Patton contends that the State entered into tacit plea agreements with both witnesses, which his counsel characterized as a "wink and [a] nod at each other and say, we'll take care of you; we just don't want to promise you anything."

To prove this claim, Patton sought to offer testimony from the attorneys who were representing Emily and Northrop in their pending first degree murder cases. In an offer of proof, Emily's attorney acknowledged that he had made repeated efforts to persuade prosecutors to transfer Emily's case to juvenile court and had filed a motion requesting the transfer, which was pending. But he stated: "There's never been an express agreement that — or anything in writing or any deal that would lead to [Emily's] going to juvenile court." He acknowledged that "everything she does towards cooperation, at this point, can only help her" and that it was his "expectation that she will end up in juvenile court based on conversations I've had." He acknowledged that in some cases, he has reached a "tacit agreement" with prosecutors with respect to a cooperating codefendant. But when asked if he had a tacit agreement with respect to Emily, he replied:

> Well, this is a little different because, again, usually I would know — I would be able to tell exactly what — when I take something to my client, I can tell them, this is how this is going to happen, this is when it's going to happen. Again, there have been no promises or actual

---

[23] *State v. Robinson*, 271 Neb. 698, 715 N.W.2d 531 (2006); *State v. Rice*, 214 Neb. 518, 335 N.W.2d 269 (1983).

[24] *Id.*

agreements made in this case for how that's going to
be done.

Emily's attorney testified that he was confident that her case
would be moved to juvenile court because of her cooperation,
age, and lack of a prior record, but stated, "I have not been
told by the prosecutor's office she will be moved up to juve-
nile court."

In a narrative offer of proof, Patton's counsel stated that
if called as a witness, Northrop's counsel would testify that
he had conversations with a prosecutor but had received "no
specific agreement in writing or one that would be put on the
record, only that it would be considered . . . they would con-
sider lesser offenses, depending on how things came out."

The district court sustained relevancy objections to both
offers of proof. We find no error in this ruling. The attorneys'
testimony would not have impeached the testimony of Emily
and Northrop, because it was consistent with both witnesses'
testimony that they hoped for leniency in exchange for their
testimony, but had received no promises or assurances from
the State. Because the attorneys' testimony fell short of estab-
lishing implied or "tacit" plea agreements benefiting Emily
and Northrop, it was irrelevant.

Nor are we persuaded by Patton's argument that the State
"opened the door" to the admissibility of the attorneys' testi-
mony by eliciting from Emily and Northrop on direct exami-
nation that they had received no promises of leniency in
exchange for their testimony.[25] The manner in which this
issue was initially raised at trial does not change the fact that
the proffered testimony of the attorneys does not contradict
or impeach the testimony of their clients that they had not
received any promise of leniency from the State in exchange
for their testimony.

### (b) *Brady/Bagley* Failure
### to Disclose

In *Brady v. Maryland*, the U.S. Supreme Court held that
the prosecution has a duty to disclose all favorable evidence

---

[25] See brief for appellant at 44.

to a criminal defendant prior to trial.[26] The Court clarified in *United States v. Bagley* that impeachment evidence, as well as exculpatory evidence, falls within the *Brady* rule.[27] Patton contends that the State failed to disclose tacit agreements with Emily and Northrop which he could have utilized to impeach their credibility.

But as we have noted, the evidence in this record does not establish the existence of tacit plea agreements between the State and the two witnesses for the prosecution. Both testified that they hoped to obtain leniency in exchange for their testimony but had not received any assurances or promises from the State. In *State v. Rice*,[28] a prosecution witness charged with the same murder as the defendant testified that he chose to testify because he felt things would go easier for him if he did, but repeatedly denied that any deal had been struck with the prosecution. We held that while this testimony established that the witness had an expectation of leniency in exchange for his testimony, it fell short of establishing an express or implied promise by the State. We reach the same conclusion here.

[13,14] For completeness, we note that Patton relies in part on documents attached as an "Appendix" to his brief in support of his argument that tacit plea agreements existed. These documents are not included in the bill of exceptions. A party's brief may not expand the evidentiary record.[29] A bill of exceptions is the only vehicle for bringing evidence before an appellate court; evidence which is not made a part of the bill of exceptions may not be considered.[30] Accordingly, we do not consider these documents in our disposition of this issue.

### 3. Emily's Involvement in Prior Robberies

Patton argues that the district court erred in sustaining the State's objection to the admission of evidence that Emily and

---

[26] *Brady v. Maryland, supra* note 21.

[27] *United States v. Bagley, supra* note 22.

[28] *State v. Rice, supra* note 23.

[29] *State v. Rust*, 247 Neb. 503, 528 N.W.2d 320 (1995).

[30] *State v. Williams*, 253 Neb. 111, 568 N.W.2d 246 (1997).

Elseman had committed other home invasion robberies of drug dealers in the months prior to the robbery and shooting of Winters and that Patton was not involved in those robberies. Prior to trial, the court sustained the State's motion in limine with respect to this evidence. In support of an offer of proof at trial, Patton offered sworn testimony of Emily admitting that she had participated in prior robberies with Elseman in which Patton was not involved. Patton's counsel stated that the evidence was not offered to show propensity, but, rather, to show that Emily and Elseman had been involved in prior similar crimes in which Patton was not a participant, which was consistent with Patton's defense that he was not a participant in the Winters robbery attempt.

We agree with the district court's determination, implicit in sustaining the State's objection, that the evidence was not relevant for any legitimate purpose, including impeachment. In addressing this identical issue in *State v. Ely*,[31] which involved another defendant convicted of Winters' murder, we stated:

> [T]he fact that Emily and Elseman may have committed prior robberies without the knowledge or participation of Ely is irrelevant to any issue in this case. . . . The fact that Ely was not involved in prior unlawful conduct has no bearing, one way or another, on the issue of whether he committed the crimes he was charged with in this case.

For the same reason, the evidence of prior home invasion robberies committed by Emily and Elseman without the participation of Patton was inadmissible in this case.

## V. CONCLUSION

For the reasons discussed, we find no reversible error and therefore affirm.

Affirmed.

---

[31] *State v. Ely*, 287 Neb. 147, 155, 841 N.W.2d 216, 223-24 (2014).